Laramore, Judge,
delivered the opinion of the court:
The plaintiffs sue to recover $309,799.29 as damages for breach of their contract with the defendant, or in the alternative, for fair compensation under section 17 (a) of the Contract Settlement Act of 1944, 58 Stat. 665, 41 Ú. S. C. §117 (1946 Ed.), for services rendered without a formal contract, and as a third alternative, the plaintiffs seek reformation of an agreement in writing on the ground of mutual mistake and of misrepresentations by the defendant and for damages for breach of the agreement as reformed.
Plaintiff National Cored Forgings Company, Incorporated (hereinafter referred to as National), is successor by change of name to the Greenport Basin and Construction Company (hereinafter referred to as Greenport). Plaintiff Marloch Manufacturing Company (hereinafter referred to as Marloch) was incorporated in the State of New York in 1946, as a wholly owned subsidiary of Greenport. In the course of its dissolution in 1947, all of Marloch’s assets, including the claims here asserted, were transferred to Green-port.
*13 At the close of World War II there was a very serious housing shortage, sharply accentuated by the large number of veterans then returning to civilian life. In an effort to alleviate this shortage, Congress passed the Veterans’ Emergency Housing Act of 1946, 60 Stat. 207, 50 U. S. C. App. § 1821 et. seq. (1946 Ed.). Section 12 of the Act provided that the powers vested in the Reconstruction Finance Corporation (hereinafter referred to as RFC) might be used to underwrite or guarantee markets for new type building materials and prefabricated houses, but only to the extent that the Housing Expediter[1] found this necessary to assure a sufficient supply for the veterans’ emergency housing program. This section also contained the standards to be applied by the Housing Expediter to such underwriting or guaranty.
We are here concerned with a controversy growing out of a contract entered into pursuant to the market guarantee program established by section 12 of the Veterans’ Emergency Housing Act, supra.
The facts which are not disputed may for purposes of this decision be summarized as follows: Pursuant to a directive of the Office of the Housing Expediter (hereinafter referred to as OHE) issued under section 12 of the Act, the RFC entered into a market guarantee contract with General Houses, Incorporated (hereinafter referred to as General Houses), an Illinois corporation, for the production of 2,000 prefabricated housing units by the end of 1947. The contract, dated February 7, 1947, contained a provision that the RFC would purchase from General Houses, at a price to be determined in accordance with a formula contained in the contract, the prefabricated houses not otherwise sold by General Houses.
General Houses was unable to get into production under the contract, and in early March of 1947 it approached Mar-loch and entered into an informal arrangement whereby Marloch would manufacture the houses at its plant with its own funds, and General Houses would act as selling agent *14 for Marloch. This arrangement was contingent upon obtaining the Government’s consent.
Thereafter meetings were held with representatives of the OHE and EFC for the purpose of obtaining the consent of the Government. As a prerequisite to entering into production of the houses Marloch indicated that it desired a transfer to it of the market guarantee contract. The OHE official who had been instrumental in negotiating the market guarantee contract expressed his approval of the new arrangement. OHE stated that an assignment of the market guarantee agreement could be made, but that the detailed administrative procedure required would take several weeks and perhaps months. OHE counsel suggested an assignment of the moneys due or to become due under the contract as a satisfactory method of affording Marloch the basic protection of the market guarantee agreement. This method met with approval and Marloch was requested to, and did, begin production immediately.
Pursuant to the oral arrangements with the Government reached at the meeting, Marloch and General Houses executed an instrument in writing dated March 14, 1947, whereby Marloch agreed to produce the 2,000 houses and General Houses agreed to sell them. On March 27, 1947, Marloch and General Houses executed an assignment under which Marloch agreed to perform all of the obligations of General Houses under the market guarantee contract. In the instrument the EFC was requested, directed, and authorized to pay to Marloch any or all moneys due or to become due from EFC to General Houses pursuant to the contract, but General Houses was to remain liable to EFC under the terms of the contract to the same extent as if the assignment had not been made. This instrument was a standard EFC form assignment of moneys due which was modified and adapted by an employee of EFC and then submitted to Marloch and General Houses for execution. The terms of the March 27 instrument were accepted and approved by EFC.
Marloch completed its first houses in May of 1947, and by June its plant was geared to produce at the rate of 20 units *15 per day. It bad no orders to fill because General Houses had not been able to obtain orders.
Marloch became compelled to seek additional financing. The bank to which it went indicated a willingness to make a loan directly to Greenport, Marloch’s parent company, upon the collateral of the market guarantee contract. Marloch consulted legal counsel as to the procedures for transferring the contract from it to Greenport, and was apprised that the assignment of March 27 might have been ineffective to give Marloch the market guarantee protection it thought it had obtained.
Marloch then sought a meeting with the Government officials in charge of the market guarantee program. At a meeting held in July of 1947, OHE gave consideration to transferring the General Houses’ market guarantee contract to plaintiffs. Shortly thereafter, however, the Government representatives took the position that Marloch did not have a contract with the Government, and despite Mar-loch’s urgings, this position was consistently maintained. Marloch discontinued production and liquidated the prefabricated housing enterprise.
Claims were then filed against the OHE and the RFC under section 17 of the Contract Settlement Act, supra. The claims were denied whereupon they were appealed to the Appeal Board of the Office of Contract Settlement. The Board granted a motion of OHE to dismiss the appeal as to it because OHE was not a “contracting agency” within the definition of section 3 (g) of the Contract Settlement Act, mpra, and held that Marloch had not proceeded “without a formal contract” within the meaning of section 17 (a) of the Act. National Cored Forgings Co., Inc. v. Reconstruction Finance Corporation, 5 App. Bd. OCS No. 353.
Plaintiff thereafter timely filed a petition in this court on November 20,1951.
On the same day that the petition was filed in this court, plaintiffs filed a complaint in the U. S. District Court for the District of Columbia, asserting there the same claims here involved, against the RFC alone, in its corporate capacity and in its own behalf. Plaintiffs and the RFC have filed a stipu *16 lation for stay of proceedings in the District Court until final action has been taken by this court.
On January 18, 1952, defendant filed a motion to dismiss plaintiffs’ petition on the ground that since plaintiffs had pending in the U. S. District Court for the District of Columbia another suit seeking the same relief on the same claim, this court had no jurisdiction under the provisions of 28 U. S. C. (Supp. V) § 1500 (1946 Ed.), quoted infra. After oral argument, the motion to dismiss was overruled by an order dated May 6,1952. Defendant then filed an answer to the petition in which it asserted as special defenses (1) the failure of the petition to state a cause of action, (2) the lack of jurisdiction in this court on the ground relied on in its motion to dismiss, and (3) that under the provisions of section 13 (b) (2) of the Contract Settlement Act, this court had no jurisdiction over suits where the RFC was the contracting agency. Defendant also set forth as an affirmative defense that plaintiffs were not entitled to relief under the Contract Settlement Act since the petition showed that plaintiffs had not met the requirements of section 17 (a) of the Act.
Plaintiffs filed a motion to strike the special defenses on the ground that they were insufficient. Defendant then filed an answer to plaintiffs’ motion to strike and a motion for judgment on the pleadings.
On September 30,1953, this court rendered a decision overruling defendant’s motion for judgment on the pleadings and striking the defenses of failure of the petition to state a cause of action under the general jurisdiction and lack of jurisdiction in this court under the provisions of 28 U. S. C. (Supp. V) § 1500 (1946 Ed.), and remanded the case for a hearing. National Cored Forgings Co., Inc., et al. v. United States, 126 C. Cls. 250.
In striking defendant’s defense under 28 U. S. C. § 1500, this court followed First National Steamship Company, et al. v. United States, 90 C. Cls. 632. In that case the petitioner had a suit pending in the District Court against the Fleet Corporation in its corporate capacity and was suing the United States in this court on the same cause of action for the acts of the Fleet Corporation as the agent of the United *17 States. The court in that case said that section 154 of the Judicial Code (36 Stat. 1087,1138), which was the predecessor of section 1500,[2] was inapplicable because the suit in the District Court was against the corporation in its corporate capacity, whereas the suit in this court was against the United States, and further the petition in the District Court did not allege that the corporation was acting or professing to act under the authority of the United States.
Although this court on two occasions overruled the defendant’s plea of lack of jurisdiction of this court by reason of 28 U. S. C. '§ 1500, and allowed the case to go to trial, defendant still maintains that this court lacks jurisdiction because of plaintiffs’ pending suit in the District Court. Inasmuch as this question goes to the jurisdiction of this court, it is considered first.
Upon further consideration of this jurisdiction question, we are of the opinion that the First National Steamship Company case, supra, should have been overruled rather than followed. Section 1500 provides:
Pendency of claims in other courts.
The Court of Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his as-signee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.
By the express terms of this section, this court is deprived of jurisdiction of any claim in respect to which the plaintiffs have pending in any other court a suit against any person who, at the time when the cause of action alleged in such suit arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States. The obvious and declared purpose of this provision was to require an election between a suit in this court against the United States and one brought in another court against *18 an agent of the United States. Matson Navigation Co. v. United States, 284 U. S. 352.
The EFC and the other Government corporations are agents of the United States and clearly, when their acts are within their statutory authority, they are acting under the authority of the United States. Cherry Cotton Mills, Inc. v. United States, 327 U. S. 536, affirming 103 C. Cls. 243; Ex Parte Skinner & Eddy Corporation, 265 U. S. 86.
When a Government corporation acting within the scope of its statutory authority makes a contract as the agent of the United States, the United States may be sued in this court as principal on the contract. Crooks Terminal Warehouses, Inc. v. United States, 92 C. Cls. 401; John Morrell & Company v. United States, 89 C. Cls. 167. This does not mean, however, that the corporation may not be sued for its action. The EFC is specifically given the power to sue and be sued in any court of competent jurisdiction, state or federal (47 Stat. 5, 15 U. S. C. § 603). The Supreme Court in Keifer & Keifer v. Reconstruction Finance Corporation, 306 U. S. 381, where the question was whether a subsidiary of the EFC was subject to suit when Congress had not specifically granted consent to have it sued, held that it was subject to suit and stated at page 390:
Because of the advantages enjoyed by the corporate device compared with conventional executive agencies, the exigencies of war and the enlarged scope of government in economic affairs have greatly extended the use of independent corporate facilities for governmental ends. In spawning these corporations during the past two decades, Congress has uniformly included amenability to law. Congress has provided for not less than forty of such corporations discharging governmental functions, and without exception the authority to-sue- and-be-sued was included. Such a firm practice is partly an indication of the present climate of opinion which has brought governmental immunity from suit into disfavor, partly it reveals a definite attitude on the part of Congress which should be given hospitable scope.
See Sloan Shipyards Corporation, et al. v. United States Shipping Board Emergency Fleet Corporation and the United States, 258 U. S. 549.
*19 For purposes of immunity from suit, priority of debts in bankruptcy, and certain criminal statutes the “present climate of opinion” has been to treat Government corporations substantially the same as private corporations. Sloan Shipyards Corporation, et al. v. United States Shipping Board Emergency Fleet Corporation and the United States, supra; Keifer & Keifer v. Reconstruction Finance Corporation, supra; Reconstruction Finance Corporation v. J. G. Menihan Corp., 312 U. S. 81; United States v. Strang, 254 U. S. 491. But as stated by the Supreme Court in Inland Waterways Corporation v. Young, 309 U. S. 517, 524, “The true nature of these modern devices for carrying out governmental functions is recognized in other legal relations when realities become decisive.” The Supreme Court in Cherry Cotton Mills v. United States, supra, where the question was whether a sum of money due petitioner from the United States could be offset against a sum of money petitioner owed the NFC, in holding that the offset was proper, stated: “That Congress chose to call it [RFC] a corporation does not alter its characteristics so as to make it something other than what it actually is, an agency selected by Government to accomplish purely governmental purposes.”
We are of the opinion that when the RFC acts within its statutory authority it contracts both in its corporate capacity and as an agent of the United States and that an aggrieved contractor with the RFC may bring his cause of action in either the District Court against the corporation or in this court against the United States. But it cannot bring a suit on the same cause of action or claim in both courts because of the prohibitions of section 1500, supra.
Ex Parte Skinner & Eddy Corporation, supra, is controlling on this jurisdictional question. The Supreme Court there held that this court was deprived of jurisdiction when the petitioner filed a suit in the state court because of section 154 of the Judicial Code, supra. The Court said at page 95:
But there is a special reason why the rule must be enforced in this case. By § 154 of the Judicial Code, it is provided that:
“No person shall file or prosecute in the Court of Claims, or in the Supreme Court on appeal therefrom, any claim for or in respect to which he or any assignee *20 of Ms has pending in any other court any suit or process against any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, mediately or immediately, under the authority of the United States.”
* * * That suit and the section of the Code just quoted necessarily prevent the petitioner from suing on those claims in the Court of Claims, and exclude its jurisdiction of them, because the Fleet Corporation which is sued in the Washington court was certainly acting or professing to act, mediately or immediately, under the authority of the United States. * * *
The plaintiffs’ petition, therefore, must be dismissed because they have the same cause of action or claim pending in the District Court against the EFC, which was acting directly or indirectly under the authority of the United States.
It is so ordered.
MaddeN, Judge; Whitakee, Judge; LittletON, Judge; and Jones, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, National Cored Forgings Co., Inc. (hereinafter called National) is a corporation organized in New Jersey in 1900. It is successor, by change of name, made in 1950, to Greenport Basin and Construction Company (hereinafter called Greenport). Plaintiff, Marloch Manufacturing Corporation (hereinafter called Marloch), was incorporated in New York in 1946 as a wholly-owned subsidiary of Greenport, for the purpose of entering into the business of manufacturing prefabricated houses. In course of its dissolution in 1947, all of Marloch’s assets, including the claims here asserted, were transferred to Greenport in exchange for the capital stock of Marloch and the assumption by Greenport of all liabilities of Marloch. By virtue of this transfer, the real party in interest is National.
2. At the close of World War II, there was a very serious housing shortage, sharply accentuated by the large numbers of veterans then returning to civilian life. To meet this *21 situation, the President, in December 1945, appointed Wilson W. Wyatt as Housing Expediter within the Office of War Mobilization and Reconversión and charged him with the responsibility of evolving and executing a program to solve the Nation’s critical housing shortage.
3. Under date of February 7, 1946, Wilson W. Wyatt, as Housing Expediter, submitted to the President a report entitled “Veterans’ Emergency Housing Program”, setting forth a series of emergency measures to be placed in effect immediately in order to solve the Nation’s housing shortage, including the construction of 2,700,000 low-cost houses to be started by the end of 1947. Of the 2,700,000 houses, 850,000 were specified to be prefabricated (or factory-built) houses.
4. One of the emergency measures recommended in the “Wyatt” report was the so-called “market guarantee program” which was designed, inter alia, to assist and induce private companies to enter into the business of producing low-priced prefabricated houses, and to stimulate the production of large numbers of such houses for sale primarily to returning veterans and their families. The essential feature of this market guarantee program was the offer by the Government to prospective producers of prefabricated houses, of a Government contract whereby the Government would undertake to purchase from the producer all houses which the producer was unable to market in private channels within a reasonable period following the production of the houses. This market guarantee program was described in the Wyatt report as follows:
While we must depend for the bulk of our homes on building by conventional methods, we will also need to stimulate a large program of factory fabrication of homes * * *.
Under these circumstances, we must encourage private firms to go into this field and do the job, with the Government assuring them of a market for the houses they build. This can be accomplished by giving a Government purchase contract to producers who sell new-type houses through normal private channels of distribution. To qualify for such a purchase contract assuring full capacity operation, the producer should establish that:
1. He is prepared to produce a house which has been *22 approved by the Government as meeting sound and tested standards of safety, durability, livability, and health.
2. The house will be sold in the lower-priced field at approximately $8,500 for a one-bedroom house plus approximately $500 for each additional bedroom (f. o. b. plant, including the necessary equipment, but excluding the cost of land and erection).
3. He had formulated an effective plan for distribution and erection which will be placed into operation to insure that houses will be put up promptly.
4. He can and will produce a specified number of houses for the 12 calendar months after the date of the Government purchase contract which assures him of a market.
Under the purchase contract, the Government will take delivery of the houses only when the producer is unable to market them within a reasonable period following their production. In that case, the Government will dispose of the homes for use in veterans’ housing, in the same manner that it now disposes of surplus property of the Government.
Some loss may result from this program, but the amount of that loss is expected to be relatively small in relation to the size of the program and to the benefits to be derived.
5.The President approved the “Veterans’ Emergency Housing Program,” and Congress provided the legislative machinery to carry it out by enacting the Veterans’ Emergency Housing Act of 1946, approved May 22,1946, 60 Stat. 207.
Section 2 of the Veterans’ Emergency Housing Act of 1946 (hereinafter referred to as the VEH Act) established the Office of Housing Expediter (hereinafter sometimes called the OHE) and defined the functions and powers of the Housing Expediter. These included the formulation of programs to alleviate the housing emergency and the power to issue orders, regulations and directives to other executive agencies to exercise their respective powers and authority to carry out said programs.
The market guarantee program was implemented by Section 12 of the VEH Act (hereinafter Section 12), which reads in pertinent part as follows:
*23 (a) The powers vested in tlie Reconstruction Finance Corporation pursuant to clause (a) of Section 5d (3) of the Reconstruction Finance Corporation Act, as amended (15 U. S. C. 606b (3)), may be used to underwrite or guarantee markets for * * * prefabricated houses, but only to the extent that the Housing Expediter finds this necessary to assure a sufficient supply for the veterans’ emergency housing program: Provided, That the number of prefabricated houses covered by outstanding underwriting or guaranty (including such houses as may be held by the Housing Expediter) shall at no time during the program exceed two hundred thousand.
(b) The following standards shall be applied by the Housing Expediter to such underwriting or guaranty.
(1) To avoid impairment of established enterprises, * * #
(2) There shall be reasonable prospect of either (A) full return to the Government of any funds involved in such underwriting or guaranty, or (B) net cost to the Government substantially lower than under any other available method of achieving the necessary expansion of production * * * The Housing Expediter shall maintain constant review of experience toward the objective that the total net costs to the Government shall in no event exceed 5 per centum of the total amount of underwriting or guaranty undertaken.
(3) There shall be clear evidence that the * * * prefabricated houses require underwriting or guaranty only temporarily * * *
(4) Emphasis shall be placed upon avoiding * * * economic dislocations * * *
(5) * * * prefabricated houses shall be tested for sound quality * * *
(6) Any underwriting or guaranty shall require adequate showing by the producer that he has sufficient working capital and experience, and that he can achieve the desired production on time under conditions satisfactory to the Housing Expediter.
6. The power that the Reconstruction Finance Corporation (hereinafter referred to as RFC) was authorized in Section 12 to use was the power granted to RFC “pursuant to clause (a) of Section 5d (3) of the Reconstruction Finance Corporation Act as amended”, (U. S. C., 1940 Ed., Supp. Y, title 15, section 606b). This was the emergency power conferred upon RFC in aid of the “national-defense program”,
*24 “to produce, acquire, carry, sell or otherwise deal in strategic or critical materials as defined by the President.”
7. Under date of September 12, 1946, the President issued a directive to RFC, under Section 12, reading, in pertinent part, as follows:
I hereby define as strategic and critical, new type building materials and prefabricated houses for which the Housing Expediter finds it necessary that markets be underwritten or guaranteed * * *.
8. The controversy involved in this case grows out of a contract entered into pursuant to the market guarantee program established by said Section 12.
9. In October of 1946, General Houses, Incorporated, (hereinafter called General Houses), a Delaware corporation, with its general office in Chicago, Illinois, filed an application with OHE for the issuance of a market guarantee contract under Section 12. A report of the OHE staff investigation |0>f General Houses’ application was sent by Robert H. Irwin, the Deputy Expediter of Industrialized Housing, to Frank Creedon, the Housing Expediter, on January 22, 1947. This report had attached seven supporting memoranda from subordinate offices in OHE. These included memoranda on (1) the “technical adequacy” of the General Houses house, (2) “the cost of comparable conventional construction,” (8) the “production ability” of General Houses, (4) the “feasibility of the production schedule as related to the corporation’s available working capital,” (5) the availability of a supply of the materials needed, (6) the “salability” of the proposed houses, and (7) negotiations for an “application for market guarantee.” This last memorandum was written by Glenn H. Beyer, one of several men who were responsible for coordinating the work with reference to negotiating contracts with manufacturers of prefabricated houses interested in obtaining a Government market guarantee. Mr. Irwin’s report on the General Houses application concluded with a recommendation that Mr. Creedon “sign the attached directive, authorizing and directing the Reconstruction Finance Corporation to negotiate the proposed market guarantee contract with General Houses, Incorporated.”
*25 Thereupon, under date of February 5, 1947, Frank Cree-don, then Housing Expediter, issued a Directive to RFC under Section 12 authorizing and directing RFC to enter into a market guarantee contract with General Houses substantially in the form of the draft contract attached to the directive. The directive recited the findings which had been made by the Housing Expediter in compliance with the standards of Section 12, and set forth the basic provisions to be incorporated in said contract. Prior to the issuance of said directive, the General Counsel of OHE had issued an opinion certifying to the legality of the proposed directive and contract.
10. Pursuant to the OHE directive, and under date of February 7, 1947, RFC entered into the contract with General Houses. General Houses obligated itself to produce 2,000 prefabricated houses by the end of 1947. Also, General Houses undertook to use its best efforts to sell the houses, but “only to persons who may purchase them under any applicable regulations issued or approved by the Housing Expediter.” RFC agreed to purchase from General Houses, at a price determined in accordance with a formula contained in the contract, the houses not otherwise sold by General Houses. The obligation of RFC to purchase said houses could be terminated by RFC upon a finding by the Housing Expediter that such termination was for the best interests of the Government. In such event, RFC was obligated to pay “termination costs” to General Houses, in accordance with Contract Settlement Act cost principles which were incorporated into the contract. A copy of said contract was received in evidence as Plaintiffs’ Exhibit No. 9, and is incorporated herein by reference.
Certain pertinent provisions of said contract read as follows:
AGREEMENT
(Market Guarantee — Prefabricated Houses)
RFC Contract No. 219-P-10
This agreement made as of the 7th day of February 1947 by and between Reconstruction Finance Corporation, 811 Vermont Avenue NW., Washington 25, D. C. (hereinafter referred to as “RFC”) and General Houses, *26 Incorporated, Daily News Building, Chicago, Illinois (hereinafter referred to as the “Contractor”).
This agreement is entered into by RFC pursuant to a directive issued to RFC by the Housing Expediter under Section 12 of the Veterans’ Emergency Housing Act of 1946. * • *
Now, THEREFOR®, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:
ARTICLE A-production AND MARKETING OF
PREFABRICATED HOUSES
1. Production, (a) The Contractor shall, during the period beginning on the date of this agreement and ending December 31, 1947 (or any earlier effective date of termination specified in a Notice of Termination given to the Contractor pursuant to paragraph 9 of Article B), produce (i. e., manufacture or assemble) prefabricated housing units in accordance with the drawings and specifications and the production schedule which have been approved by the Housing Expediter and are incorporated in Exhibit A; * * *
2. Marketing.
(b) The Contractor shall * * * exercise its best efforts to sell the prefabricated housing units produced hereunder to purchasers (having satisfactory credit ratings in cases of credit sales) at the Contractor’s standard delivery prices (which the Contractor shall at all times maintain but may revise from time to time), and shall without undue delay accept orders from such purchasers and shall deliver the units to such purchasers promptly after production thereof.
Í M
5. Eligible Purchasers. The Contractor shall sell such prefabricated housing units only to persons who may purchase them under any applicable regulations issued or approved bj^ the Housing Expediter. * * *
ARTICLE B — PURCHASE BT RFC
RFC shall purchase prefabricated housing units produced pursuant to Article A which, not having otherwise been sold by the Contractor, the Contractor may tender to RFC subject to the following terms and conditions:
* * * * #
1. Units Covered by Guarantee. The obligation of RFC to purchase prefabricated housing units shall extend only to such units the production of which is com *27 pleted by the Contractor during the period beginning on the date of this agreement and ending December 31, 1947_ (or any earlier effective date of termination specified in a Notice of Termination given to the Contractor pursuant to paragraph 9 of this Article); provided, however:
(a) That if the Housing Expediter finds that on December 31, 1947, the Contractor has any such units in process which in the normal course of production would have been completed by that date and that the Contractor was unable to complete them by that date only because of circumstances (including but not restricted to acts of God or of the public enemy, acts or orders of Government, floods, fire, strikes, freight embargoes, or unavailability or delay in delivery of any material necessary for the production of such prefabricated housing units) which in the judgment of the Housing Expediter were beyond the Contractor’s control and without its fault or negligence, the Contractor may, although such units are completed after December 31,1947, tender the completed units to RFC in accordance with the terms and conditions set forth in this Article, * * *
(b) That if the Contractor has completed the production of prefabricated housing units in accordance with the specifications set forth in Exhibit A with the sole exception that one or more of the component parts listed in JPart IV of Exhibit A are omitted only because of circumstances (including but not restricted to acts of God or of the public enemy, acts or orders of Government, floods, fire, strikes, freight embargoes, or unavailability or delay in delivery of any material necessary for the. production of such prefabricated housing units) which in the judgment of the Housing Expediter are beyond the Contractor’s control and without its fault or negligence, the Contractor may tender such partially-completed units to RFC in accordance with the terms and conditions set forth in this Article, provided that in no event shall tender of any such unit be made after December 31, 1947. No such unit may be tendered to RFC earlier than 30 days after the date on which it is completed except for the omission of said part or parts, unless earlier tender shall be approved by RFC (or unless December 31, 1947, is less than 30 days following such date, in which case tender may be made not later than December 31,1947, without regard to the limitation of this sentence). If any of the parts omitted from such units become available while such units remain in storage for RFC pursuant to Article C, the Contractor shall, unless otherwise directed by RFC, apply said *28 parts to such units before applying them to any other units, and the Contractor shall be entitled to receive therefor the amounts of estimated cost of said parts then indicated in Part IY of Exhibit A or, at NFC’s election, the cost of such parts determined in the manner provided in paragraph 8 of this Article for the determination of cost of completed or partially-completed units purchased by NFC.
# & Hi # ❖
2. Time of Tender, (a) Completed units shall not be tendered to NFC earlier than 30 days after the date of completion of production thereof, unless earlier tender shall be approved by NFC, or later than 120 days after the date of completion of production thereof.
*****
3. Number of Units. The maximum number of units eligible for tender pursuant to paragraph 1 of this Article, which NFC shall be obligated to purchase at the time of any tender, shall be computed as follows:
(a) With respect to completed units, the maximum number for each type of unit specified in Exhibit A shall be the number by which the number of completed units of such type which the Contractor has on hand at the close of the day preceding the date of tender exceeds the number of units of such type for which the Contractor has accepted and unfilled purchase orders on hand at the close of the day preceding the date of tender.
(b) With respect to partially-completed units, the maximum number for each type of unit specified in Exhibit A shall be the number thereof eligible for tender pursuant to subparagraph (b) of paragraph 1 of this Article at the close of the day preceding the date of tender.
* # * * *
5. Tender. Tender shall be made by mailing to NFC, at 811 Vermont Avenue, Washington 25, D. C., by registered mail, a notice of tender in form required by NFC, together with such documents of title as NFC may require and the warranties to NFC mentioned in paragraph 4 of this Article. The date of mailing such notice and documents to NFC shall be deemed the date of tender for the purposes of this Article.
6. RFC Purchase Price. The purchase price which NFC shall be obligated to pay for each completed or partially-completed unit of any type purchased by NFC hereunder shall be the cost of the unit determined in accordance with the cost and accounting principles speci *29 fied in Article K: provided, however, that such RFC purchase price shall in no event exceed a maximum amount which,
(a) in the case of a completed unit, shall be the lesser of the following: (i) 90 percent of the Contractor’s standard f. o. b. plant delivery price in effect on the date of tender with respect to sale of a unit of such type to a purchaser of the class to which the Contractor’s lowest delivery price is applicable, or (ii) the limit of allowable cost, as defined in paragraph 7 of this Article, for a unit of such type, in effect as of the date of tender; and
(b) in the case of a partially-completed unit, shall be the maximum amount provided in subdivision (a) above for a completed unit of such type, minus the total of the amounts of estimated cost indicated in Part IY of Exhibit A for the parts therein listed which are omitted from the partially-completed unit.
1. Limit of Allowable Oost. The “limit of allowable cost,” to which reference is made in subparagraph (a) of paragraph 6 of this Article, is the amount, as estimated by the Contractor and approved by the Housing Expediter, which reasonably will cover the Contractor^ unit cost of each type of prefabricated housing unit specified in Exhibit A. * * *
* * * *
9. Termination of BFO Purchase Obligation. The obligation of RFC to purchase prefabricated housing units under this Article may be terminated by RFC whenever the Housing Expediter determines that such termination is for the best interests of the Government. Such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the date upon which such termination shall become effective.
Such termination shall not affect any obligation of RFC under this Article to purchase prefabricated housing units the production of which is completed before the effective date of termination, or any other obligation or right of RFC or of the Contractor under this agreement with respect to such completed units.
In the event of such termination, the Contractor shall terminate the work of producing all units remaining to be produced hereunder and shall be entitled to payment from RFC by reason of such termination of work.
‡ $ ii $ $
(d) The total sum to be paid to the Contractor under subparagraphs (b) and (c) of this paragraph 9 shall *30 not exceed tbe total amount of purchase price which RFC would have been obligated to pay to the Contractor if RFC had purchased from the Contractor the number of units of each type with respect to which work was terminated pursuant to this paragraph 9 at a price per unit of each type equal to the lesser of the following: (i) 90 percent of the Contractor’s standard f. o. b. plant delivery price in effect on the effective date of termination with respect to sale of a ,unit of such type to a purchaser of the class to which the Contractor’s lowest delivery price is applicable, or (ii) the limit of allowable cost, as defined in paragraph Y of this Article, for a unit of such type, in effect as of the effective date of termination.
% * % iji $
ARTICLE G — REPORTS
Within 20 days after the end of each calendar month during which this agreement or any part thereof remains in effect, the Contractor shall furnish RFC with a report for said month, in form satisfactory to RFC, showing, by totals for each type of prefabricated housing unit specified in Exhibit A and for each type of such unit not specified in Exhibit A:
$ $ * ‡ ‡
ARTICLE K — COST AND ACCOUNTING PRINCIPLES
The cost and accounting principles to which reference is made in paragraphs 6, Y, and 8 of Article B shall be those set forth in “Explanation of Principles for Determination of Costs under Government Contracts” (issued by the War and Navy Departments and published April 1942 by the United States Government Printing Office, receipt of a copy of which is hereby acknowledged by the Contractor, and which is hereby incorporated in and made a part of this agreement with the same force and effect as if fully set forth herein); subject, however, to the following exception:
The provisions of paragraphs 48, 49, 50, 51, and 52, and item (t) of paragraph 54 of said “Explanation of Principles” shall not be applicable. Admissible selling and advertising costs, however, shall be limited to expenditures that are reasonable as to nature and amount and are in harmony with the purposes and interests of the veterans’ emergency housing program as supervised by the Housing Expediter.
*31 ARTICLE M — ASSIGNMENT
The Contractor stall not assign this agreement or any part hereof or any claim for moneys due hereunder without the prior written consent of NFC. * * *
In witness whereof, the parties hereto have caused six copies of this agreement to be executed by their duly authorized officers or representatives, as of the date first above written.
General Houses, Incorporated,
(S) By Frank M. Noberts,

President.

Beconstruction Finance Corporation,
(S) By Stuart K. Barnes,
Executive Director,

Office of Defense Supplies.

(seal)
Hi Hi # # H«
(general houses) exhibit a
I. Drawings and Specifications
Hi H! H« ^ Hi
II. Production Schedule

III.Limits of Allowable Cost

Ht Hi ❖ H* H*
11. Mr. Irwin’s report of January 22,1947, to Mr. Creedon stated in part as follows:
Founded in 1929, General Houses was one of the first organizations working on the development of designs for permanent houses of sound quality, through *32 the use of mass production and prefabrication techniques. During the history of the Company its operations have been concerned primarily with development and research work although many of the units which the Company has designed have been subcontracted and built. This Company was directly responsible for five war housing projects, four in the east and one in California. Company officials advise that approximately $365,000 has already been expended in development and research work and $50,000 in its dealer organization.
12. At the time of the execution of said contract on February 7,1947, it was understood that General Houses was undertaking the ownership and financial responsibility involved in the production of the houses. At that time, General Houses did not have a plant in which to produce the houses. Instead, it was negotiating for the lease from War Assets Administration of a war surplus plant located in New Orleans, said plant having been frozen for the use of General Houses by War Assets Administration at the request of OHE. Also at that time, General Houses did not have an operating organization or machinery and equipment, or the materials with which to produce the houses. Instead, it was relying on an arrangement it had made with the Houston Ready-Cut Company of Houston, Texas (hereinafter called Houston), whereby Houston would assist in the preliminary set-up work; would make available to General Houses some top operating personnel, including superintendents; and would assist General Houses in establishing contacts with suppliers of lumber and other necessary materials. Houston was to be reimbursed for its costs of these services and was to share in the profits of the venture, but it did not undertake any ownership or financial responsibility. Also, at the time of the execution of the contract, General Houses did not have the capital required to finance the venture. Virtually all of its capital had been previously spent in research and development of designs of prefabricated houses, and in the building up of a dealer organization to distribute prefabricated houses, and it had a very slender cash position. Therefore, as of February 7, 1947, General Houses was relying on obtaining a loan of $450,000 for which it had previously applied to RFC. One of the conditions *33 which RFC had specified for obtaining this loan was that General Houses obtain from private sources an additional investment of $150,000 in equity capital, it having estimated that a total of $600,000 in initial capital was needed to launch the venture of producing the 2,000 houses. Also, it was contemplated that the primary collateral to be pledged by General Houses to RFC for this loan was an assignment by General Houses to RFC of any moneys payable to General Houses by RFC under the market guarantee contract itself.
13. Approximately a month passed after the date of the execution of the market guarantee contract, but General Houses had not been able to obtain the capital needed to finance the venture, or to take any other steps to get into production of the houses. In early March 1947, it approached Marloch and entered into an informal arrangement with Marloch, whereby Marloch would undertake to produce the houses at its own plant located at Greenport, Long Island, with its own funds, and whereby General Houses would act as general selling agent for Marloch. Since Marloch was to supply the necessary capital to finance the venture, and had its own plant, and was actually to produce the houses, and since General Houses was to act merely as selling agent, it was understood that General Houses would withdraw its application for the RFC loan, would discontinue negotiations for lease of the plant in New Orleans, and was not to use the services of Houston. This entire arrangement was conditioned, however, upon obtaining the Government’s consent to a transfer or assignment of the market guarantee contract to Marloch, so that Mar-loch, as producer of the houses, would have the protection of such contract.
The agreement between General Houses and Marloch was made on March 6, 1947, but no contract between the companies was executed at that time.
On March 7, 1947, Frank Roberts, President of General Houses telephoned Glenn H. Beyer of the OHE in Washington, D. C., for the purpose of arranging a meeting for himself and representatives of Marloch with Mr. Beyer on March 10, 1947. Mr. Roberts had negotiated the General Houses *34 market guarantee contract with OHE. Mr. Beyer was the OHE employee who had conducted such negotiations for OHE.
14. At the meeting which began on March 10,1947, in the offices of OHE in Washington, D. C., Mr. Eoberts represented General Houses, and the representatives of Marloch were Marshall E. Tulloch, President of the Company, Charles M. Eoss, a certified public accountant and financial adviser to Mr. Tulloch, and Joseph M. Baltz, Vice President of the Company.
During the first day, Glenn H. Beyer, the contract negotiator for OHE, was present throughout the meeting, and at times there were discussions with his superior, Eichard W. Alger, who by that time had succeeded Mr. Irwin, and was in over-all charge of the market guarantee program for OHE. At that time, OHE was headed by Frank E. Creedon as the Housing Expediter, and Mr. Alger served under him as Deputy Expediter. Mr. Beyer was one of several contract negotiators subordinate to Mr. Alger. Mr. Beyer had no authority to prepare market guarantee contracts or to change provisions contained in any such contract. All parties present knew that market guarantee contracts could be signed only by Stuart K. Barnes, Executive Director of the Office of Defense Supplies, EFC, upon the basis of the directives issued by the Housing Expediter. However, as stated above, Beyer had negotiated the market guarantee contract with General Houses and he was the individual in OHE with whom General Houses had dealt in the transactions affecting the contract. Consequently, he was regarded by Marloch and General Houses as the key Government employee to be consulted on the matters to be presented at the meeting.
Mr. Eoberts informed Mr. Beyer that Houston was unable to manufacture the houses called for under the market guarantee contract and that General Houses proposed to enter into an agreement with Marloch, which would produce the houses under an entirely different arrangement than that previously existing between General Houses and Houston. It was further explained that Marloch had the necessary plant facilities and would provide its own funds for the *35 production of tbe houses without a loan from NFC, and that this plan would enable General Houses to withdraw its pending application for a $450,000 loan from KFC, as well as the application to lease the New Orleans war surplus plant. Under the plan as outlined to Mr. Beyer, General Houses was to act as selling agent for the houses manufactured by Marloch. Marloch and General Houses presented to Mr. Beyer a copy of the contract that they proposed to enter into, and this document was left in the files of OHE.
Mr. Beyer was to some extent familiar with the resources of Marloch, because it then had pending an application for a market guarantee contract. The representatives of Marloch presented information as to the prior manufacturing experience of Greenport, and they exhibited financial statements, showing that Marloch had a net worth of $400,000 and no liabilities. Its assets consisted of the land and plant facilities which had been transferred by Greenport and $100,000 in cash in the bank. The financial statements also showed that Greenport had a net worth in excess of $1,000,000. After examining the statements, the representatives of OHE were satisfied that Marloch would be able to produce the houses and Mr. Beyer stated that OHE was anxious to get Marloch into production of the houses as soon as possible. OHE had set a goal of 850,000 prefabricated houses to be started by the end of 1947, and at the time of the March meeting, the program was badly lagging behind the goal. Furthermore, the market guarantee contract held by General Houses called for the manufacture of ten houses by March 31,1947. Mr. Roberts then explained to Beyer that the proposed arrangement between General Houses and Marloch was contingent upon an assignment or transfer of the market guarantee contract to Marloch. Mr. Beyer also was informed by the representatives of Marloch that it would not undertake the production of the houses nor enter into an agreement with General Houses unless Marloch could receive the benefit of the financial protection and guarantees provided for in the market guarantee contract. In this connection, Mr. Roberts stated that General Houses and Marloch desired to obtain a letter from OHE to RFC, directing or authorizing RFC to make the transfer or assignment to Marloch. *36 Although, he voiced no objection to the proposal, Mr. Beyer replied that such a transfer or assignment involved legal questions beyond his responsibility, and he recessed the meeting to the following morning with the assurance that he would then have an attorney from the office of the General Counsel of OHE present.
Prior to the resumption of the meeting in the offices of OHE on the morning of March 11, 1947, Mr. Beyer telephoned Miss Louise McCarthy, an attorney on the staff of the General Counsel of OHE and arranged for her to be present to discuss the question of assigning the market guarantee contract. After Miss McCarthy arrived at the meeting, she explained that the contract could be assigned or transferred to Marloch but that this would require the same detailed administrative procedure as in the case of a producer originally seeking a market guarantee contract. In view of the shortness of time remaining for the production of the houses under the contract held by General Houses and the fact that the whole program was lagging, this statement was disturbing to Mr. Beyer, who pointed out that the delay would probably amount to many weeks and perhaps several months. There ensued a discussion as to other means for accomplishing the objectives of the parties without incurring a long delay.
From an inquiry addressed to Mr. Tulloch, Miss McCarthy learned that Marloch’s chief concern was to make certain that it would receive any money which RFC was obligated to pay under the terms of the contract. She then suggested that this could be accomplished by an assignment of moneys due. During the meeting, there were several telephone calls by Mr. Beyer and Miss McCarthy to representatives of RFC, and finally it was generally agreed that the device which Miss McCarthy had proposed would serve the purposes of all parties concerned. Thereupon, Miss McCarthy arranged an appointment the next day between the representatives of General Houses, Marloch, and RFC, and the meeting adjourned.
15. Miss McCarthy, who was the only lawyer present during the meetings, understood the distinction between the assignment of the contract and an assignment of moneys due *37 thereunder, but she did not explain her concept of how the assignment would operate. She was shown a copy of the proposed contract between General Houses and Marloch, but she did not read it and her information generally was limited to an understanding that Marloch was to manufacture the houses and General Houses was to sell them. She knew that before houses could be tendered to RFC under the market guarantee agreement, the company making the tender would have to furnish evidence of unencumbered title to the houses, and she assumed that General Houses would buy the houses produced by Marloch.
Mr. Beyer was not an attorney and did not understand the legal effect of the proposed assignment of moneys due. Without discussing the matter, he assumed that Marloch was the subcontractor under General Houses, but he knew that General Houses was not to take title to the units manufactured by Marloch. It is clear from all the evidence that he believed that the device suggested by Miss McCarthy would give Marloch the basic financial protection afforded by the market guarantee contract.
Mr. Tulloch, Marloch’s president, had been in business for about 35 years and during the period from 1937 to near the end of World War II, Greenport, of which he was president, had from 20 to 25 Government contracts, and Mr. Tul-loch had experience in assigning some of the Government contracts to banks. During the war, Greenport had employed at times as many as 1,200 people and had done a gross volume of business amounting to about $6,000,000 a year. As president of Greenport, Mr. Tulloch was paid an annual salary of $52,000. However, he did not attach any significance to the expression “assignment of moneys due” as used by Miss McCarthy.
There was no discussion by any of the parties during the 2-day meeting at OHE of the details as to how or by whom the houses were to be tendered in the event they were not sold to the public, nor as to how Marloch would be paid in the event the Government terminated the contract pursuant to Article B-9 thereof. The representatives of Marloch realized that the technique suggested by Miss McCarthy was something different than the complete transfer of the market *38 guarantee contract, which Mr. Roberts had proposed. However, both Mr. Roberts and Marloch’s representatives believed, on the basis of the discussion at the meeting, that the type of assignment suggested by Miss McCarthy would give Marloch the same protection it would have received under the proposal advanced by Mr. Roberts.
16. On March 11, 1947, after the close of the meeting at OHE, Mr. Roberts, Mr. Tulloch, and Mr. Ross went to Mr. Tulloch’s hotel room where they conferred for about an hour with William M. Aiken. Mr. Aiken was Mr. Roberts’ personal attorney and had been engaged by him to prepare an assignment on behalf of General Houses. Mr. Aiken took some notes at the conference and returned to his office to prepare the assignment.
On the following morning, March 12, 1947, Roberts, Tulloch, Ross and Aiken met with Gordon Miller, a clerk in the office of Richard K. Bloch, an attorney who handled the Veterans’ Emergency Housing Program for RFC under the supervision of Stuart K. Barnes, the Executive Director of the Office of Defense Supplies. Miss McCarthy of OHE had previously arranged the appointment with Mr. Miller. Mr. Aiken presented the document he had prepared to Mr. Miller, who indicated that it was generally satisfactory but that a few changes would probably be required. From the statements he made, it appeared that the changes would be minor in nature. Mr. Aiken died several years prior to the trial of this case, and neither of the parties has been able to locate a copy of the assignment prepared by him and presented to Mr. Miller at RFC on March 12, 1947.
Immediately after the meeting with Mr. Miller, Mr. Ross and Mr. Tulloch left for New York with the understanding that Mr. Roberts would remain in Washington, D. C., until the assignment was changed so as to satisfy RFC and would then bring the assignment to New York, where it would be executed by Mr. Roberts and Mr. Tulloch on behalf of their companies. It was also agreed that the proposed contract between Marloch and General Houses would be executed at the same time as the assignment.
17. Shortly after the March 10-11,1947, meeting at OHE, Miss McCarthy drafted a letter to RFC for the signature *39 of the Housing Expediter. This letter, which was sent to RFC on March 13,1947, read as follows:
On February 7,1947, the Reconstruction Finance Corporation entered into a market guarantee agreement (RFC Contract No. 219-P-10) with General Houses, Inc., of Chicago, Illinois. By the terms of the agreement the RFC guarantees a market for 2,000 prefabricated houses to be produced by General Houses, Inc.
At the time the agreement was executed it was contemplated that General Houses, Inc., would borrow up to $450,000 from the RFC and that it would assign the moneys due or to become due under the market guarantee Agreement to the RFC. Article M of the agreement provides that General Houses, Inc. shall not assign it or any part of it or any claim for moneys due under it without the prior written consent of the RFC. At the time the agreement was executed, General Houses, Inc. also contemplated that the Houston Ready-Cut House Company of Houston, Texas, would do the actual fabrication of the houses for General Houses, Inc.
Since the execution of the agreement, General Houses, Inc. has requested my approval of a change in its financial and production plans under which the physical fabrication would be performed by the Marloch Manufacturing Corporation at Greenport, New York, which will be able to make its own financial arrangements. The Marloch Manufacturing Corporation expects to use its own capital for all or the major portion of its financing. If it requires additional capital it will borrow from the Bank of the Manhattan Company. General Houses, Inc. therefore desires to withdraw its application for a loan from the RFC.
I am satisfied that the proposal of General Houses, Inc. for the substitution of the Marloch Manufacturing Corporation for Houston Ready-Cut House Company and the withdrawal of its request for a loan from the RFC will not affect the ability of General Houses, Inc. to achieve the production of the prefabricated houses on time or its ability to acquire sufficient working capital.
To carry out the proposed change in plans, it will be necessary for General Houses, Inc., to assign the moneys due or to become due under the market guarantee agreement to the Marloch Manufacturing Corporation, and it may also be necessary for the Marloch Manufacturing Corporation to assign the moneys due or to become due it to the Bank of the Manhattan Company. Accordingly, I concur in the request of General Houses, Inc., that the RFC consent to the assignment of the moneys *40 due under the market guarantee agreement (RFC Contract No. 219-P-10) to the Marloch Manufacturing Corporation, 295 Madison Avenue, New York City, and to a possible further assignment by the Marloch Manufacturing Corporation of the moneys due or to become due it, to the Bank of the Manhattan Company, 40 Wall Street, New York City.
18. On March 14, 1947, Stuart K. Barnes, Executive Director of the Office of Defense Supplies in RFC, wrote General Houses, consenting to the assignment of moneys due or to become due under the market guarantee contract. The letter read in pertinent part as follows:
The Office of the Housing Expediter has advised this Corporation that, since the execution of the captioned Market Guarantee Agreement, your financing and production plans have been changed. Whereas it was originally contemplated that General Houses, Inc. would borrow up to $450,000 from this Corporation and assign the monies due or to become due under the captioned contract to Reconstruction Finance Corporation, it is now the intention to secure private capital. In addition, we understand that the actual fabrication of the houses, which was originally to have been performed by the Houston Ready-Cut House Company of Houston, Texas, will now be performed by the Marloch Manufacturing Corporation at Greenport, New York. It is indicated that Marloch expects to use its own capital for all or the major portion of its financing and that if additional capital is required, Marloch will borrow from the Bank of the Manhattan Company.
To carry out these changes in plans we are informed that it will be necessary for General Houses, Inc., to assign the monies due or to become due under the captioned contract to Marloch Manufacturing Corporation and further that it may be necessary for Marloch Manufacturing Corporation to assign the monies due or to become due it to the Bank of the Manhattan Company. The Housing Expediter has indicated that he is satisfied that the substitution of Marloch Manufacturing Company for Houston Ready-Cut House Company will not affect the ability of General Houses, Inc., to achieve the production of the prefabricated houses within the time contemplated by the captioned contract.
Accordingly, you are advised that Reconstruction Finance Corporation will consent to the assignment by General Houses, Incorporated, of the monies due or to *41 become due it under tbe captioned contract to Marloch Manufacturing Corporation, 295 Madison Avenue, New York City. Reconstruction Finance Corporation will further consent to the assignment by Marloch Manufacturing Corporation of the monies due or to become due to it under such assignment of General Houses, Incorporated, to the Bank of the Manhattan Company, 40 Wall Street, New York City. It is understood and agreed that each assignment referred to above shall be prepared in form and manner acceptable to Reconstruction Finance Corporation and that the assignee shall file with Reconstruction Finance Corporation four signed copies of a written notice of the assignment and four signed copies of the instrument of assignment. Notwithstanding either or both of such assignments it is understood and agreed that General Houses, Incorporated, shall remain liable under the terms of this agreement to the same extent as if such assignment or assignments had not been made.
Mr. Roberts acknowledged receipt of the above letter by signing his name on behalf of General Houses and returning a copy to RFC.
19. On March 14,1947, Mr. Roberts called on Mr. Tulloch in New York with an instrument of assignment, stating that Mr. Aiken had advised him that it was in a form which was acceptable to RFC. Thereupon on March 14,1947, Marloch and General Houses executed the assignment, which is set forth in full below:
ASSIGNMENT
General Houses, Inc., hereby assigns to Marloch Manufacturing Corporation, as security for any sum which may become due from General Houses, Inc., to Marloch under a contract between them dated March 14th, 1947, any claim General Houses may have against the Reconstruction Finance Corporation for money due or to become due under Contract #219-P-10 for the production of 2,000 prefabricated houses between General Houses and Reconstruction Finance Corporation dated February 7,1947.
In consideration of this assignment, Marloch assumes and hereby agrees to perform all those obligations of General Houses under said contract between General Houses and R. F. C. dated February 7, 1947, which relate to the production of houses.
*42 In witness whereof, the parties hereto have hereunto set their respective signatures and seals this 14th day of March, 1947.
General Houses, Inc., a Delaware Corporation,
(S) By Frank M. Roberts,

President.

Attest:
(S) William M. Aiken,

Asst. Secretary.

Marloch Manufacturing Corporation, a New York Corporation,
(S) By Marshall E. Tulloch,

President.

Attest:
(S) G. H. Snyder,

Secretary.

The executed assignment was returned to RFC accompanied by a letter of March 14,1947, from Mr. Tulloch. The letter, which was apparently dictated by him, was addressed to the Office of Defense Supplies, RFC, and read as follows:
This corporation hereby gives written notice of the assignment to it by General Houses, Inc., having its offices in the Chicago Daily News Building, Chicago, Illinois, of the monies due or to become due to General Houses from the Reconstruction Finance Corporation under the terms of Market Guarantee Contract 219-P-10.
In accordance with the instructions contained in your letter to General Houses, Inc., dated March 14, we enclose herewith four signed copies of the Instrument of Assignment.
We would appreciate an official acknowledgment of this letter so that it may be attached to our legal papers.
20. Also on March 14,1947, the contract between Marloch and General Houses was executed in behalf of the two companies by Mr. Roberts and Mr. Tulloch. This contract, which had been drafted prior to March 14, 1947, is in evidence as Plaintiffs’ Exhibit 26 (A). After referring to the fact that General Houses was the obligee under an RFC market guarantee contract, that General Houses had a sales organization but no production facilities, and that Marloch *43 bad production facilities for the fabrication of tbe houses, the contract provided in part as follows:
1. Marloch agrees to manufacture and produce at its plant at Greenport, New York, prefabricated housing units of the type described in said Beconstruction Finance Corporation market guarantee contract and to deliver said houses free on board public carriers at said Greenport plant for shipment to such locations and at such distances as General Houses may from time to time direct.
2. General Houses will furnish to Marloch drawings, specifications, technical services, technical engineering data and advice necessary to enable Marloch to produce said houses efficiently and economically. Marloch will be solely responsible for internal production engineering and plant layout in said Greenport plant.
3. All houses manufactured by Marloch will be sold by General Houses through its own dealer organization.
4. For each house manufactured by Marloch, Marloch will be paid a firm, fixed price in the amount stated in Exhibit A hereto attached, and said price will be subject to change upon twenty (20) days notice by Marloch. Terms of payment for houses manufactured by Marloch shall be sight draft with bill of lading attached, to be paid by the dealer to a Chicago bank acceptable to both parties. An arrangement shall be made with said bank whereby there will be deducted from each such dealer’s payment the amount thereof due from General Houses to Marloch and deposited to the account of Marloch. The balance of such payment shall be deposited to the account of General Houses. This arrangement for payment will not be publicized to the dealers or be made known to them by either of the parties hereto.
5. In the event, and only in the event, that Marloch shall, during the term of this contract, have on hand any houses manufactured by it under the terms of this contract and shall have no instructions from General Houses as to the place for shipment of said Houses, Mar-loch shall be free to sell said houses otherwise than through General Houses and its dealer organization; Provided, however, that said houses shall not be sold y Marloch for less than the price to be paid Marloch for said houses by General Houses in effect during the time said houses were manufactured, plus shipping costs.
Marloch and General Houses also entered into a supplementary agreement, and it was likewise dated March 14, 1947. Although the evidence does not show when this docu *44 ment was prepared, it was not executed by Mr. Tulloch on behalf of Marloch until March 17, 1947. The supplemental contract provided in pertinent part as follows:
Whereas the parties hereto did heretofore, under date of March 14, 1947, enter into a contract for the manufacture and sale of certain prefabricated housing units;
Whereas the parties hereto contemplate implementing said contract by the assignment to Marloch of the market guarantee contract between Keconstruction Finance Corporation and General Houses dated February 7,1947;
Now, thereeore, in consideration of the mutual promises hereinafter contained the parties hereto mutually covenant and agree as follows:
1. In the event said market guarantee contract be so assigned, or in the event the above described contract between the parties hereto becomes operative without any such assignment, and in the further event that claims against the Keconstruction Finance Corporation should arise either on account of termination or tender of housing units pursuant to the terms of said market guarantee contract, the parties hereto mutually promise and agree that neither shall look to the other for, or claim or demand from the other, any part of any of such claims, but shall look for the satisfaction of any such claims under said market guarantee contract to Kecon-struction Finance Corporation only.
21. The March 14 assignment (Finding 19) was submitted by Mr. Aiken to Kichard K. Bloch, the KFC attorney who was in charge of handling the market guarantee contracts under the supervision of Mr. Barnes. Mr. Bloch had been the principal draftsman of the standard form of market guarantee contract, and was well acquainted with all of its terms and provisions. He had also read the letter which had been sent by the Housing Expediter to KFC on March 13, 1947 (Finding 17) and knew that Marloch was to produce the houses called for under the market guarantee contract which had been entered into between General Houses and KFC. However, Mr. Bloch had not seen a copy of the contract between Marloch and General Houses and was not informed as to the details of the contractual relationship between the two companies.
After examining the March 14 assignment, he objected to the second paragraph thereof on the ground that it might be *45 ambiguous and requested that said paragraph be amended in order to remove any doubt that General Houses would remain liable to RFC under the market guarantee contract, notwithstanding the assignment. Thereupon, Mr. Bloch and Mr. Aiken collaborated in the preparation of a third form of assignment, which was subsequently executed by Marloch and General Houses under date of March 27,1947, and was accepted by RFC. This instrument is in evidence as Plaintiffs’ Exhibit 18 (a) and reads as follows:
ASSIGNMENT
For value received and as collateral security for any and all moneys which now are or hereafter may become due from General Houses, Inc. (hereinafter called “General Houses”) to Marloch Manufacturing Corporation (hereinafter called “Marloch”), General Houses hereby assigns to Marloch, its successors and assigns, any and all moneys which now are or hereafter may become due from Reconstruction Finance Corporation (hereinafter called “RFC”) to General Houses pursuant to the terms of the market guarantee agreement on prefabricated houses entered into by RFC and General Houses under date of February 7, 1947, and bearing RFC contract No. 219-P-10.
RFC is hereby expressly requested, directed and authorized to settle with and pay to Marloch any and all of said moneys due from RFC to General Houses pursuant to said agreement, and the receipt therefor of Marloch, its successors or assigns, shall be final and binding on General Houses as an acquittance of RFC, which is hereby expressly relieved of any obligation to see to the use or application by Marloch, its successors or assigns, of any moneys so paid.
Marloch hereby accepts the foregoing assignment, and in consideration thereof hereby agrees to perform all the obligations of General Houses to be performed under said agreement (including the obligation to refund to RFC any overpayments which may be made), but, notwithstanding the foregoing assignment, General Houses shall remain liable to RFC under the terms of said agreement to the same extent as if the foregoing had not been made. Indication of the foregoing assignment shall be made on all notices, vouchers and other documents given or presented to RFC in connection with any matter relating to said agreement.
*46 In witness whereof, the parties have duly executed this instrument this 27th day of March, 1947.
General Houses, Inc., _ a Delaware Corporation,
(S) By Frank M. Boberts,

President.

(TiUe)
(S) ¥m. M. Aiken,

Assistant Secretary.

Marloch Manufacturing Corporation, a New York Corporation,
(S) By M. E. Tullooh,

President.

(Title)
22. As stated in a preceding finding, the OHE was anxious for Marloch to begin the production of houses as soon as possible. Immediately after the March 10-11, 1947 meetings with the employees of OHE and with Mr. Miller of RFC, the representatives of Marloch returned to New York. Belying on the statements that had been made at the two meetings and without waiting for the execution and approval of the assignment, Mr. Tulloch took prompt steps to get Marloch into production of prefabricated houses as soon as possible. These steps included the opening of the plant at Greenport, the placing of orders for equipment and raw materials, and the hiring of key personnel. By the middle of May 1947, the plant was equipped and manned to produce houses and a pilot house was erected inside one of the buildings about that time. In the latter part of May, two sample houses were erected at Marloch’s expense outside the plant. By June 1947, about 10 houses were ready for delivery, and there was sufficient material on hand to manufacture about 135 more houses.
23. After the production of the houses started, Mr. Beyer conferred with General Houses regarding difficulties encountered in obtaining an FHA ruling, which would authorize FHA mortgage insurance on houses sold to the public.
OHE required the submission of a progress report known as the “prefabricator’s monthly report,” which contained information as to the number of units completed and delivered to purchasers each month, as well as information as to the *47 number of orders accepted but not filled. Such reports for the months of February, March, April, July, August, and September 1947 were signed by officials of General Houses and submitted to OHE. The reports for May and June 1947 are not in evidence.
Mr. Tulloch knew that such reports were required to be submitted. Mr. Baltz, production manager for Marloch, furnished General Houses information as to the number of houses produced. Apparently General Houses supplied the data covering sales and orders, and also compiled the reports.
24. The prefabricated house designed by General Houses and produced by Marloch was a 2-bedroom house of wood construction, using the ladder panel system for floors, walls, and ceilings. Each house required about 108 panels which were fabricated on jig tables. It took about 15 minutes to manufacture each panel, and there were 18 jig tables in the Greenport plant at the time Marloch ceased the manufacture of the houses. Therefore, at that time, the equipment in use could produce about five houses per day. Since only a portion of the available plant’s space was devoted to the production of houses, additional jig tables and machinery could have been installed in order to increase the production to as much as 20 houses per day. However, General Houses, which had undertaken to act as selling agent for Marloch under the contract between the two companies, had not been able to obtain any orders. In the beginning, there was some delay in obtaining FHA approval for financing the purchase of the houses, and difficulty was encountered in complying with the requirements of local building codes in some localities. By the end of June 1947, General Houses had sold only one house, and Marloch had run out of working capital because of its expenditures on labor and overhead.
When this situation developed, Marloch and Greenport decided to place the resources of Greenport directly in the housing venture. It was contemplated that Marloch would be dissolved and that its assets would be transferred to Greenport in return for Marloch’s stock, so that thereafter Greenport would produce the houses. When Mr. Tulloch presented this proposal to the bank from which Greenport expected to borrow money for the manufacture of the houses, *48 he was informed that if it advanced any funds, the bank would require the transfer of the market guarantee contract to Greenport.
25. On June 19,1947, Mr. Beyer had a telephone conversation with Mr. Boss, Marloch’s accountant, in which Mr. Ross stated that Marloch was being dissolved and that Greenport would request a transfer of the assignment of moneys due under the market guarantee contract.
Sometime in June 1947, Mr. Tulloch employed I. S. Weiss-brodt, an attorney in Washington, D. C., and requested his attorney to take the necessary steps with OHE and RFC for transferring the market guarantee contract to Greenport. Shortly thereafter, Mr. Weissbrodt called on Mr. Bloch at the RFC and showed him the original and supplementary contracts which had been entered into between General Houses and Marloch. Mr. Weissbrodt asked Mr. Bloch whether in his opinion General Houses was obligated under the contracts to buy any houses that Marloch produced and to pay Marloch termination costs in the event General Houses terminated the contract. Mr. Weissbrodt expressed the opinion that no such protection was afforded Marloch under the contracts, and Mr. Bloch agreed.
Mr. Weissbrodt further stated that he had attempted to obtain a reformation of the contract between General Houses and Marloch, but that General Houses had refused to agree to any changes in the agreement.
He then inquired whether RFC could amend the market guarantee agreement in such a way as to afford direct guarantee protection to Marloch, and Mr. Bloch replied that this could not be done without the consent of General Houses. There was no discussion specifically regarding Marloch’s right to tender houses to RFC under the terms of the assignment of March 27, 1947, but the tenor of the conversation between the two attorneys was to the effect that Marloch had no such right.
26. During the course of further negotiations with OHE, Marloch’s representatives learned that OHE, as well as RFC, had taken the position that the assignment of March 27,1947, did not give Marloch the right to tender houses under the market guarantee contract or to receive termination ex *49 penses in the event the Government terminated the contract, and this information was passed on to Mr. Tulloch. OHE knew that General Houses had not been able to sell the houses produced by Marloch and had been informed about the contemplated new agreement between Marloch and Greenport. Consequently, during the latter part of June 1947, OHE was giving consideration to a transfer of the General Houses market guarantee contract to Greenport after Marloch was dissolved.
27. At Mr. Tulloch’s request, a meeting was held on July 9,1947, in the office of Richard W. Alger of OHE at which Mr. Alger and Miss McCarthy represented OHE. Representatives of Marloch included Mr. Tulloch, Mr. Weiss-brodt, Mr. Boss, and his partner Mr. Burnett. Mr. Beyer was on vacation and was not present at the meeting.
Although Mi*. Alger had general responsibility for conducting the market guarantee program under the supervision of the Housing Expediter, certain duties in connection with that program were also performed by the Technical Branch of the Program Branch, the Materials Supplies Branch, and the General Counsel’s office in OHE.
Mr. Tulloch explained the financial difficulties which Marloch had encountered as the result of the failure of General Houses to sell any of the houses. Prior to the meeting he had learned that both OHE and RFC had taken the position that Marloch had only derivative rights under the assignment, and he requested that the Government enter into an agreement with Marloch under which Marloch would be granted the right to tender houses directly to RFC in the event the houses were not sold, and also the right to termination expenses if the Government terminated the contract. Mr. Alger did not make any specific commitments as to what action would be taken by OHE but adjourned the meeting with the request that Marl&cn submit to him a written statement setting forth its position and its proposal.
On the same day a letter was prepared, signed by Mr. Tulloch as President of Marloch, and sent to Mr. Alger. As will hereinafter appear, this letter, which was dated July 9,1947, was transmitted by Mr. Alger, along with his memorandum of July 11, 1947, to the Assistant General Counsel *50 of OHE. Since there is a conflict in the evidence as to what was said at the meeting, the letter and memorandum constitute the best evidence of what transpired at the meeting.
28. In the letter of July 9,1947, from Marloch to Mr. Alger, the first two paragraphs thereof read as follows:
In line with your request at our meeting today, I am sending this letter to you in order that you may have before you, in writing, our situation with respect to production of prefabricated housing units under the terms of the market guarantee contract and other instruments executed between NFC, General Houses, Inc. and Marloch Manufacturing Corporation.
As you know, under date of February 7, 1947, upon the direction of the Housing Expediter, the NFC entered into a market guarantee contract with General Houses for 2,000 prefabricated housing units. Under date of March 14, 1947, General Houses entered into an agreement and a supplemental agreement with Marloch Manufacturing Corporation with respect to the production and distribution of prefabricated housing units. Under date of March 27,1947, General Houses, with the consent of NFC, assigned to Marloch all moneys due or to become due from NFC under the market guarantee contract. Copies of the two agreements dated March 14,1947, and the assignment dated March 27,1947, were left with Miss McCarthy of your legal staff at our meeting today.
The letter then outlined the action which had been taken by Marloch to acquire facilities for the production of the houses, summarized the work which had been accomplished, and pointed out that General Houses had been able to sell only one house. The letter then continued as follows:
In order to supplement the sales efforts of General Houses, we have taken certain steps to form our own sales organization in the Eastern territory, including engaging the services of certain initial key personnel. We are willing to take further steps to perfect the sales organization. However, before we make these additional investments for further production, as well as distribution, the company is anxious to obtain your assurance that it has the rights which were intended for the producer under the market guarantee contract.
As you recall, at the time the market guarantee contract of February 7,1947, was executed, General Houses had entered into arrangements with Houston Neady-Cut *51 House Co. for the production of the prefabricated housing units. Also, I understand that General Houses had obtained authorization, from NFC, for a Government loan of $450,000 to finance the production. When the arrangements between General Houses and Houston Beady-Cut failed, General Houses entered into new contracts with Marloch for the production of the houses. It was agreeable to Marloch to finance the production of the houses entirely out of private resources and not to seek a Government loan, provided that it obtained from the Government the protection of the Government’s market guarantee contract. This was agreeable to all parties, including the Government. Originally, it was intended to accomplish this objective through the medium of an outright assignment of the market guarantee contract by General Houses to Marloch. However, at the request of the Government, and primarily, as I understand it, to save time, the matter was worked out through an assignment by General Houses to Marloch of all moneys due or to become due from NFC under the market guarantee contract. As you confirmed in our discussion today, it was intended through this assignment to give to Marloch the protection afforded to a producer under the market guarantee contract.
It now appears, however, that because of certain ambiguities in the actual written assignment, some doubts have arisen as to whether Marloch has this protection. As I have stated, we are ready to continue to produce houses. We are ready to take steps to assist in selling the houses. As we have advised you, we propose to do this by transferring all the assets of Marloch to The Greenport Basin and Construction Company, which owns all of the stock of Marloch. A copy of a recent audited financial statement of Greenport has been submitted to you. As this statement shows, Greenport is a substantially stronger company than Marloch. Green-port will supply the additional funds, carry on the production, and, in addition, will supplement General Houses’ sales efforts. However, before doing this, we would like to have a clear understanding as to our position in relation to market guarantee protection. In particular, we would like assurance from the Housing Expediter and the NFC that:
1. In the event that the Housing Expediter, pursuant to paragraph “9” of Article “B” of the market guarantee contract, determines that it is for the best interest of the Government that the obligation of NFC to purchase units under the contract be terminated and such *52 obligation of RFC is terminated, and Greenport accordingly stops the work of producing all units that remain to be produced under the contract, then Green-port is entitled to payment from RFC for its costs as a producer.
2. In the event that, despite the combined sales efforts of General Houses and Greenport, no market is found for the prefabricated housing units, the RFC, pursuant to Article “B” of the market guarantee contract, will accept tenders of such unsold houses from Greenport.
3. A mutually satisfactory procedure will be arranged whereby the present production schedule, the present plans and specifications of the house and the present limit on allowable cost may be adjusted in accordance with the current situation.
I am confident from our discussion today that you will agree that my position in this is fair and reasonable since I am merely requesting your assurance that we have or will receive the protection that all parties intended and contemplated that we have in the first instance. I am in no way suggesting that the rights or protection presently afforded to General Houses be impaired.
May I point out again that we are faced now with decisions of a critical nature and it is very urgent that we have your answer promptly.
# * l|t # #
29. On July 10 and 11,1947, Mr. Weissbrodt forwarded to Mr. Alger two drafts of a proposed agreement to be executed by Greenport and RFC. Both drafts, which were similar in content, recited that when the assignment of March 27,1947, was executed it was the intention of the Government to assign to Marloch the rights, as well as the obligations, of the “contractor” under the market guarantee contract; that in reliance on this understanding, Marloch had invested substantial sums in the production of the houses, and that Greenport stood ready to invest additional sums for the same purpose. Following these recitals, the proposed agreement read as follows:
Now therefore, in consideration of the mutual promises hereinafter contained, the parties hereto agree as follows:
1. In its administration of the General Houses market guarantee agreement and in its interpretation of the assignment entered into between General Houses and Marloch, dated March 27,1947.
*53 (a) In the event that the Housing Expediter, pursuant to paragraph “9”, Article “b”_of said market guarantee agreement, determines that it is for the best interest of the Government that the obligation of EFC to purchase units under said market guarantee agreement be terminated, and such obligation of EFC is terminated, and Greenport, in accordance with said market guarantee agreement, stops the work of producing all units that remain to be produced under said market guarantee agreement, EFC shall accord to Greenport the rights of the “Contractor” under paragraph “9”, Article “B” of said market guarantee agreement.
(b) In the event that the prefabricated housing units produced by Greenport, pursuant to said market guarantee agreement, have not otherwise been sold by GenERAl Houses or Greenport, EFC shall accord to Green-port the rights of the “Contractor” to tender houses to EFC in accordance with the terms of Article “B”’ of said market guarantee agreement.
2. Greenport shall not at any time hereafter, without the prior consent of EFC, release General Houses from its assignment to Greenport of any and all moneys which now or hereafter may become due from EFC to General Houses pursuant to the terms of General Houses market guarantee agreement.
3. Greenport hereby expressly agrees to perform all the obligations of the “Contractor” to be performed under said market guarantee agreement (including the agreement to refund to EFC any overpayments which may be made).
H: # ❖
The first of two covering letters, which accompanied the drafts, stated that Marloch would be glad to discuss the proposed agreement, or any changes deemed necessary by Mr. Alger, or to suggest alternative approaches. The second closed with the following statement:
Mr. Tulloch has asked me to express his sincere appreciation of your cooperation and your willingness to arrive at a fair solution which will relieve him of his present equivocal position.
30. Mr. Tulloch’s letter of July 9,1947, and the drafts of proposed agreements mentioned above were transmitted by Mr. Alger to Arnold Coplan, Assistant General Counsel of OHE, along with Mr. Alger’s memorandum of July 11, 1947, which read as follows:
*54 The contract between General Houses and the Government under date of February 7, 1947 provided for 2,000 prefabricated housing units. These were to be produced at Houston, Texas under a subcontract to the Houston Keady-Cut Manufacturing Company. Subsequent to the signing of the contract with General Houses, Houston Ready-Cut asked to be released from their subcontract which was granted by General Houses and under date of March 14, 1947 General Houses entered into a similar agreement with the Marloeh Manufacturing Corp. to produce the houses.
This necessitated the expenditure of considerable money by Marloeh to equip a plant for production of houses. Under this agreement Marloeh was to produce and ship on orders secured by General Houses. Since that time, General Houses has furnished Marloeh with only one order for one house.
There is attached a letter from Marloeh to me dated July 9 which cites the situation as it now stands and can be taken as substantially correct as far as material facts are concerned.
During the period between the March 14 date and the present serious and, to date, unsolved differences have arisen between General Houses and Marloeh. In the assignment dated March 27, it was felt that all the machinery had been set up to safeguard the interests of both Marloeh and General Houses.
It now develops that Marloeh has no primary rights as to either tender or termination. They claim that they stand ready to proceed with production and with sales on their own account as quickly as this matter is cleared up.
This office has tried to work out with General Houses and with Marloeh a satisfactory solution. Marloeh asked for a general discussion between General Houses, itself, and this office which we tentatively agreed to. In trying to arrange for this conference we felt that General Houses did not care to participate and claimed in long telephone conversations with M. Beyer, Mr. Kurasch, Miss McCarthy and me that Marloeh was trying to jockey them out of the contract for the purpose of assuming it itself.
As a result of these three-cornered discussions with the approval of Miss McCarthy, I wired General Houses on July 8, as follows: “Confirming telephone conversations with Thomas Fisher today this office is looking to you to produce houses according to your contract. You are now behind your contract production schedule *55 some 440 houses. Eequest you advise this office by wire not later than Thursday July 10 what production you propose from now on. The difficulties between you and your contractor are of interest to this office only insofar as they affect production.” Under the same date I wired Marloch Manufacturing Company as follows: “We have wired General Houses to advise this office as to what production they proposed from now on, stating that differences between prime contractor and subcontractor are of interest to this office only in respect to production prospects. Meeting contemplated will not be held tomorrow.” As of today no answer has been received from General Houses, not even acknowledgment of receipt of the wire.
On Wednesday July 9, representatives of the Marloch Manufacturing Corp. appeared in my office to state their case which was exactly what appears in the letter attached. Miss McCarthy was present at this interview. I told them that no action of any kind would be taken until after the expiration of July 10, nor would I give them any indication of any proposed action. I did request that they put their case in writing and that they also prepare a suggested remedy. Their case is stated in their letter of July 9 and I am attaching hereto a suggestion from them as to what they think might be done.
In my judgment, we should now take steps to accomplish Marloch’s wishes without jeopardizing the Government’s interest. I think General Houses should be immediately notified by wire that we are proposing to to take such action, and I suggest that you prepare such a wire.
I am asking Mr. Kurasch to contact you with this memorandum and with all papers so that action can be taken quickly. Bepresentatives of the Marloch Company are now in Washington and desire to remain here until they can be assured that some such action is in process.
31. Miss McCarthy, who was in charge of the Market Guarantee Section in the Office of the General Counsel of OHE and who had attended both of the meetings held between Marloch and OHE, left on her vacation on July 10, 1947, and did not return until July 19,1947. She did not discuss the July 9, 1947, meeting with Mr. Coplan, the Assistant General Counsel, before she left. In her absence, Mr. Alger forwarded Marloch’s letter of July 9, 1947, the pro *56 posed agreements, and Ms memorandum of July 11,1947, to Mr. Coplan.
After receiving the above-described papers from Mr1. Alger, Mr. Coplan discussed the matter with Mr. Bloch of RFC, and both attorneys concluded that the Government could not enter into the agreement proposed by Marloch unless General Houses became a partjr to that agreement. At the time of these discussions, Mt. Coplan had before him Mr. Alger’s memorandum and knew that General Houses had entered into a market guarantee contract, which obligated it to produce and sell the houses, and that Marloch and General Houses had entered into a contract under the terms of which Marloch was to produce the houses and General Houses was to sell them. However, Mr. Coplan was not familiar with the terms of the assignment of March 27,1947. He knew that an assignment had been executed, but he assumed that it was nothing more than a simple assignment of moneys due, and he had no understanding that Marloch had, in the instrument of assignment, undertaken any of the obligations of the market guarantee contract.
After talking with Mr. Bloch, Mr. Coplan discussed the matter with Mr. Alger and also with Mr. Weissbrodt. On July 14, 1947, Mr. Coplan sent the following memorandum to Mr. Alger:
I have reviewed the contract and other documents which have heretofore been entered into between the two above-named companies, as well as Marloch’s letter to you of July 9, 1947. I have also discussed the matter with Mr. Weissbrodt, Marloch’s attorney. Following that, I discussed the matter at length with Mr. Richard Bloch of the RFC.
I have also reviewed the draft agreement proposed by Mr. Weissbrodt, which was attached to your memorandum, as well as a revised form of this proposed draft which was submitted by Mr. Weissbrodt today.
At present, Marloch is a subcontractor of General Houses, and can obtain the benefits from the market guarantee contract only on a derivative basis through General Houses. Although Marloch has an assignment from General Houses of all moneys due or to become due mider the market guarantee contract, this applies only to such moneys as may be due to General Houses, who is the only “contractor” under the market guaran *57 tee agreement. Mr. Weissbrodt’s proposal, in essence, is that Marloch shall be given the status of a direct contractor with the Government, in place of or on a parity with General Houses, but without the, consent or signature of General Houses. Both Mr. Bloch and I feel that this is impossible. If the BFC were to enter into an agreement with Marloch, the Government would be exposed to a possible duplication or overlapping of risk and liability. For General Houses would still retain its rights under the market guarantee agreement and at the same time parallel rights would have been granted to Marloch by virtue of the new agreement.
I note the statement in Marloch’s letter to you that when the previous assignment by General Houses to Marloch was executed, it was originally intended that an outright assignment of the market guarantee contract be made, but that, at the request of the Government and primarily to save time, the assignment that was made was an assignment of moneys due under the market guarantee agreement. I have no knowledge about this, nor does Mr. Bloch. The Expediter’s letter to the BFC requesting them to approve the assignment, specifically covered only an assignment of moneys due or to become due under the market guarantee agreement. However, even supposing that the original intent was to make an assignment of all rights under the market guarantee contract, this intent cannot now be effectuated without the written consent of General Houses, for otherwise the Government would be exposed to possible additional risks which could not be defended or justified.
You appreciate, of course, that Marloch is not completely without protection under the market guarantee agreement. For example, if Marloch has produced houses for which General Houses has failed to furnish orders, and if (as is probably the case) Marloch is entitled to be paid for its production by General Houses, Marloch may press its claim for payment and thereby, in effect, force General Houses to tender under the market guarantee agreement. Likewise, in the event of a termination by the Government of the market guarantee agreement, the agreement provides that General Houses must terminate its subcontracts and settle the subcontractors’ claims arising from the termination, and the cost of settling such claims are part of the amount payable by the Government. Therefore, should there be a termination of the market guarantee agreement, and therefore a termination by General Houses of its contract with Marloch, such amounts as Marloch may be entitled *58 to receive from General Houses by reason of such, termination would be payable by tbe Government.
The foregoing was pointed out to Mr. Weissbrodt both by me and, on an earlier occasion, by Mr. Bloch. Apparently, however, Marloch is not satisfied with such protection as it may have been on a derivative basis through General Houses, but wishes to acquire the status of a direct contractor with the Government, in place of or on a parity with General Houses. As stated above, this is impossible without the consent of General Houses.
It is notable that the statement of facts by Marloch and General Houses are contradictory in that Marloch asserts that General Houses is failing to obtain orders, while General Houses is stating that Marloch is not producing rapidly enough. It may be desirable that a field investigation be made in order to obtain evidence of the actual facts. Moreover, if in fact, General Houses is not obtaining sufficient orders, the prospects of a tender are likely. In such event, a careful investigation of all of the steps which General Houses has taken in attempting to market the houses and of the extent of which it has followed its approved marketing plan should be made. For, if an investigation should disclose that General Houses has not used its best efforts to sell or has failed substantially to carry out its approved marketing plan, there might be a basis for rescinding the contract and refusing to accept any tenders.
32. In order to acquaint Miss McCarthy with the action taken by him, Mr. Coplan prepared a memorandum, which he sent her under date of July 17,1947. It read as follows:
On Friday, July 11, Marloch submitted a long letter which they had indicated they would submit, together with a proposed form of agreement to be entered into by RFC with Marloch. Under the proposed agreement, RFC would give Marloch an independent right to make tenders and would also agree to pay Marloch termination costs in the event of termination of the market guarantee agreement.
I discussed this with Dick Bloch on Friday, the 11th. On Monday, the 14th, I sent a memorandum to Alger advising that the proposed form of agreement was no good because it proposed to give Marloch separate rights under the same market guarantee agreement, and this would involve possible duplication of liability on the part of the Government.
On Monday morning I met with Lefty, Dave Cobb, and Dick Alger, at which time they were told the same *59 thing. Alger then told them that he could not take any action with respect to Marloch until after he had been in touch with General Houses to obtain the facts from their point of view. Lefty was obviously unhappy about this because it meant further delay. So he and Dave Cobb persisted in having further meeting with me and Dick Bloch to determine whether there were ways of working out an agreement, still without the participation of General Houses, but with provisions which would protect the Government against duplication of liability. This meeting was cut short and was then resumed on Tuesday afternoon. The net result of that meeting was that Dick Bloch insisted that because of the interrelationships between the various contracts, it seemed to him that no form of agreement suggested up to that point would be workable or feasible.
In the meantime, on Tuesday, Alger sent a telegram to several of the officials of General Houses, which I prepared. The telegram asked them to come in on Wednesday. As a result of the telegrams they asked their Washington attorney, Mr. Martin, to come in to see Alger on Wednesday morning. I met with Alger and Martin. I explained to Martin, Marloch’s concern about lack of protection in the event of a termination, and Martin’s reaction was very favorable. He realized that failing to give the protection to Marloch would put no extra money in General Houses’ pocket, and that giving them the protection would not cause General Houses any loss. I also told Martin of Marloch’s desire to have an independent right to make tenders, and suggested that they might consider giving Marloch an agreement that under specified circumstances Marloch would be authorized to make tenders as the agent of General Houses.
Martin stated that he would contact his people and notify us further of what might be done. He said also that he saw no objection to General Houses amending their March contract with Marloch to give Marloch termination rights as in the war contracts.
In the course of the discussions, it became increasingly clear to us that Lefty has had negotiations with General Houses on this matter and that he was not telling us any details of what went on. In other words, he was not being frank with us at all. We began to get the feeling that Lefty was trying to gain extra rights from General Houses, but when he found that General Houses was unwilling or was exacting a price which Marloch was unwilling to pay, decided to come in to the Housing *60 Expediter and negotiate the same results by means of a side agreement without General _ Houses’ consent. Martin’s reaction to the Monday meeting was consistent with this because when we explained Marloch’s termination problem, he thought that it was entirely reasonable to take care of that and said that he thought what Mar-loch wanted was to take over General Houses’ rights under the market guarantee agreement.
On Wednesday I prepared a letter for Alger which was sent to Marloch, answering their long letter and saying that after many discussions it was not feasible to give them independent rights under the market guárante b agreement without the participation of General Houses, as General Houses is the party to the market guarantee agreement.
In the meantime Alger received a long telegram in reply to our telegram of Monday, giving a great deal more information than we had before and stating flatly that Marloch was attempting to place the Government in the middle and use the Government as a tool to help Marloch get something which they had failed to obtain directly from General Houses. Late Wednesday afternoon Alger received a phone call from Martin saying that Martin had been in touch with Tom Fisher of General Houses, and that Fisher was pleasantly surprised to learn that the Government didn’t have horns and that what we were asking them to do was something reasonable and which Martin found himself able to recommend. He said also that General Houses was going to send us a full and complete report on their sales efforts. He said also that they expected they would be able to resolve their differences with Marloch.
Alger and I both feel at this point that we should definitely no longer consider under any circumstances any separate deal with Marloch.
_ Dick Bloch also feels that we should remain on the sidelines, that Marloch and General Houses should work out their own changes and we at most look at the job after it is done. Dick also feels that if we are asked to place any interpretations on what they work out, we should not make any commitments but leave them to act on their own responsibility.
33. As indicated in the memorandum to Miss McCarthy, Mr. Coplan prepared a letter to Marloch for Mr. Alger’s signature. The letter, which was signed by Mr. Alger and sent to Marloch under date of July 16,1947, read as follows:
*61 This is in reply to your letter of July 9,1947, in which you present certain problems which you have in connection with your contract with General Houses, Inc., who has a market guarantee agreement with Reconstruction Finance Corporation, covering the production of prefabricated housing units. In order to settle those problems, you requested that the Government enter into an agreement with you which would grant you certain rights under the General Houses market guarantee agreement.
Since receiving your letter, we and our attorneys have spent a great deal of time discussing your proposal with your attorneys, Cobb and Weissbrodt, as well as with representatives of the RFC. As you probably know from your attorneys, it has so far not been possible to develop any feasible basis for granting such rights to you without the participation of General Houses, Inc., in view of the fact that the Government’s market guarantee agreement is with General Houses, Inc.
34. After Marloch received the OHE letter of July 16, 1947, from Mr. Alger, production was discontinued and the housing venture was completely liquidated. When fabrication operations ceased early in August 1947, Marloch had produced a total of 35 houses, consisting of 33 complete housing units in panel form and two demonstration houses which had been erected. Liquidation operations were actually conducted by Greenport and consisted in selling the houses, machinery, fixtures; the discharge of all personnel, except Mr. Tulloch, and the cancellation of outstanding contracts and commitments for material and equipment.
35. After liquidation, plaintiff filed claims under Section 17 (a) of the Contract Settlement Act with both RFC and OHE. These claims were denied under findings made March 6, 1950, by Edward J. Clapp, Jr., Chief, Contract Liquidation Branch, RFC, and also by findings dated June 3,1950, by Ed. Dupree, General Counsel, OHE. Thereupon, plaintiffs appealed to the Appeal Board of the Office of Contract Settlement, which in its decision of August 24, 1951, dismissed the appeal, insofar as it related to Marloch’s claim against OHE. It held that OHE was not a “contracting agency” within the definition of Section 3 (g) of the Contract Settlement Act. In the same decision, the *62 Board affirmed tbe RFC findings on tbe ground that Mar-locb had not proceeded “without a formal contract” within the meaning of Section 17 (a) of the Contract Settlement Act.[1]
3@. The facts relating to the issues (a) whether in the transactions involved here, RFC acted in its corporate capacity or as an agent of the United States, and (2) whether the materials arranged to be furnished by plaintiffs “related to the prosecution of the war”, are set forth, in part, in Findings 2 to 7 inclusive.
By Executive Order 9686 issued January 26, 1946 (11 F. R. 1033), the Housing Expediter was authorized to:
1 (a) Formulate such plans and programs as are necessary to provide for an increased supply of housing accommodations of all kinds and, in particular, of homes available for sale or rental at moderate prices to veterans of World War II and their immediate families.
(b) Issue such orders, regulations, or directives to other executive agencies as may be necessary to provide for the exercise of their powers in a manner required by or consistent with the execution of the aforesaid plans and programs, and to coordinate the activities of such agencies directed to the execution of such plans and pro-Srams. Each executive agency shall carry out without elay the orders, regulations, or directives of the Housing Expediter, and shall, to the extent necessary, consistent with governing statutes, modify its operations and procedures from time to time to conform to the directions of the Housing Expediter.
On January 29,1946, Wilson W. Wyatt was also appointed by the President as the Administrator of the National Housing Agency, which had been created by Executive Order 9070 on February 24, 1942, to centralize non-farm housing responsibilities formerly assigned to other Government agencies. After Mr. Wyatt had been appointed to this additional position and after the passage of the VEH Act, the staffs of NHA and OHE were merged. This situation continued until January 1947 when, by Executive Order 9280 (12 F. R. 205), the powers, functions, and duties of the *63 Housing Expediter were segregated from those of the Administrator of NBA, and it was ordered that powers, functions, and duties of the Housing Expediter be exercised and performed by him as an independent office of the Government.
The manner in which the market guarantee contract with General Houses was initiated, negotiated, approved, and executed as set forth in Findings 9 and 11 inclusive, is typical of the procedure used in the case of other market guarantee contracts at the time pertinent to this action. The program authorized by the VEH Act was publicized by OHE, which invited prospective producers of prefabricated houses to get in touch with it. OHE also issued a formal set of instructions and requirements entitled “Market Guarantee Instructions,” including forms on which applicants were required to submit detailed data. After an application was received, OHE made its investigation, covering such matters as the ability and experience of the producer, the type and cost of the house to be manufactured, the schedule of production, the marketing facilities to be utilized, and the working capital of the producer.
Following a determination by OHE that a market guarantee was necessary and after further negotiation with the applicant, the Deputy Expediter submitted to the Housing-Expediter a report and recommendation that the directive to EFO be issued. As shown by Plaintiffs’ Exhibit 6, this report consisted of findings made by the Deputy Expediter, on the basis of memoranda prepared by his staff and attached to the report, with respect to the number of units to be produced, the production schedule, the type of house and its basic selling price F. O. B. factory, the “limit of allowable cost” (i. e. the unit price to be paid the producer by the Government under the guarantee provided for in Article B of the contract) , the prospects of a full return to the Government of any funds involved in the market guarantee, and other information needed by the Housing Expediter for the preparation of findings to be made by him and included in the directive to EFO in compliance with the provisions of the VEH Act.
The General Counsel of OHE then issued an opinion attesting to the legality of the proposed contract and to the legality of the proposed directive by the Housing Expediter to EFO.
*64 In connection with the application filed by General Houses, the General Counsel of OHE submitted to the Housing Expediter an opinion which, after referring to the report that had been submitted by the staff to the Housing Expediter, read in part as follows:
In view of this data, you are justified in making the findings contained in the directive to the Reconstruction Finance Corporation which directs that Agency to enter into the market guarantee agreement.
_ The directive when executed by you will be legal and binding upon the Reconstruction Finance Corporation and an agreement of market guarantee entered into by the Reconstruction Finance Corporation in compliance with the directive will be a valid and binding agreement.
The form of market guarantee agreement which has been agreed on in substance between this office and the Reconstruction Finance Corporation is attached to the directive. Under its terms the contractor undertakes to produce prefabricated housing units and to sell them to purchasers, other than the Reconstruction Finance Corporation. If the contractor is unable to dispose of the houses to purchasers other than the Reconstruction Finance Corporation, that agency agrees to buy up to 2,000 of such unsold houses. ***:&>!!
In my opinion the agreement when properly executed by the Reconstruction Finance Corporation and the contractor will be valid and binding and will be one which the Housing Expediter has the legal power to direct the Reconstruction Finance Corporation to execute under the Veterans’ Emergency Housing Act of 1946.
Thereafter, the Housing Expediter issued the directive to RFC. This document, which is in evidence as Plaintiffs’ Exhibit 5, was entitled “Directive to the Reconstruction Finance Corporation on Market Guarantee Agreement.”
In its application to OHE, General Houses proposed a production of 23,800 houses by December 31, 1947. This program would have required financial assistance from the Government in the amount of $3,500,000. After some discussion and negotiation with RFC, from which the funds were to be borrowed, General Houses agreed to reduce the production schedule to 2,000 houses and applied for an RFC loan of $450,000. Aside from this, the record does not dis *65 close that there were any other negotiations between BFC and General Houses as to the provisions of the market guarantee contract.
37. As was explained in the Government press release issued at the time the Veterans’ Emergency Housing Program was launched, the most attractive feature of the market guarantee contract to the producer was the obligation of the Government to purchase any of the houses which the producer could not otherwise sell. The purpose of this feature was to induce the producer to swing into full production at the outset instead of gradually stepping up production as the market for the houses widened.
As shown by Article B-6 of the contract (Finding 10), the price to be paid by EFC on tender of the houses was fixed by a formula in the contract. That price was the contractor’s cost of the unit, determined in accordance with certain cost accounting principles and subject to the proviso that in no event was the price to exceed the lower of either (1) 90 percent of the contractor’s standard F. O. B. plant delivery price for the unit, or (2) the limit of allowable costs, which was the amount (as estimated by the contractor and approved by the Housing Expediter) that would reasonably cover the contractor’s unit cost. The limit of allowable costs specified in the General Houses contract was $2,413 per house.
In establishing the limit of allowable costs, the OHE first proceeded by determining an F. O. B. factory selling price, which it would validate and which included a 10 percent profit over all costs, both direct and indirect. The amount of profit was then deducted. After adding or deducting any amounts due to changes in the plans and specifications, an adjusted cost figure was arrived at by the OHE negotiator, and a 10 percent allowance was added for contingencies. The resultant figure was the limit of allowable costs, and this figure was specified in the contract. In making this calculation, OHE used an average cost for the total number of units to be produced under the terms of the contract, allocating overhead charges, plant burden, and all other costs on the basis of the total production. The limit of allowable costs thus determined was based on the theory that if the estimates of cost were reasonably correct, a contractor, who *66 produced all of the bouses called for by the contract and was unable to sell any of them, could tender the houses to RFC and be reimbursed for his expenditures but would not make a profit.
38. Article B-5 of the market guarantee contract specified that the tender of the houses be made by mailing to RFC a notice of tender in a form required by RFC, together with such documents of title as RFC might require and a showing of compliance with the warranties provided for in Article B-4. RFC adopted a procedure under which it required that the documents of title show clear and unencumbered title in the contractor making the tender.
The General Houses market guarantee contract was never terminated for the best interests of the Government in accordance with the provisions of Article B-9. Marloch did not undertake to tender any of the houses it had produced to the RFC, because the Government had informed Marloch that it had no right of tender under the market guarantee contract. Although Marloch learned, after the controversy arose, that the Government would accept tender only from General Houses, no tender to RFC was made by General Houses. The terms of the contract between Marloch and General Houses (Finding 20), provided that Marloch was to ship the houses to dealers as directed by General Houses and that the dealers were to pay for the houses upon receipt of the bills of lading. General Houses did not have any funds with which it could have purchased the houses from Marloch, and it was in no position to meet the requirements of the contract relating to tender of the houses.
39. In the liquidation of the housing venture, Greenport realized the sum of $98,459.84 from the sale of the 35 houses, which represented Marloch’s total production. The houses sold for $14,004.84 more than if they had been tendered to RFC at the $2,413 limit of allowable costs provided for in the contract. However, since the 35 houses amounted to such a small proportion of the 2,000 houses called for in the contract, Marloch’s actual cost for the production of the 35 houses was greatly in excess of the sum realized from their sale.
*67 40. Under the alternative canses of action asserted in the petition, plaintiffs seek recovery in the amount of $309,-799.29 as unrecovered costs on the prefabricated housing venture. Pursuant to Kule 28 and prior to trial, plaintiffs submitted to defendant a schedule from their books and records, showing the costs and expenses claimed. Thereafter, the books and records from which the schedules were made were duly examined by the defendant. Plaintiffs’ claim consists of the following classifications:
Manufacturing costs, less recoveries_ $99,189.11
Cost of installation of special facilities_ 1, 524.45
Loss on the liquidation of special facilities_ 18,547.64
Jigs, fixtures, templates, etc. written off_ 3, 524. 70
Plant expense during liquidation of venture_ 15, 917.85
Administration and selling expense_ 171,095.54
41. Manufacturing Oosts Less Recoveries.
Marloch began preliminary work on the production of the prefabricated houses on March 17,1947, and terminated such production early in August 1947. Its total manufacturing costs during this period amounted to $290,267.63. In the liquidation of the housing venture, the sum of $191,078.52 was realized from the sale of completed units, house panels, parts and inventory. This resulted in a net loss of $99,-189.11. Plaintiffs’ manufacturing costs reflect the large initial costs which were necessarily incurred in getting production started and are reasonable under the conditions which existed. While defendant denies that it is liable to plaintiff in any amount, it does not dispute the accuracy of the amount of plaintiffs’ net loss on manufacturing operations, except for an item of $19,743.75, which was included in factory overhead expense. This item, which was labeled “Engineering Fees” in plaintiffs’ schedules, arose out of the provisions of the contract between Marloch and General Houses under the terms of which General Houses agreed to furnish Marloch drawings, specifications, technical services, and engineering data. At the time the contract between the two companies was made, General Houses was short of working capital and Marloch estimated that the minimum needs of General Houses for working capital was $40,000. Accordingly, in paragraph 7 of its contract with General *68 Houses (Plaintiffs’ Exhibit 26-A), Marloeh agreed to pay General Houses the sum of $20,000, upon submission to Mar-loch of an accounting certificate showing that General Plouses had added an equivalent sum to its working capital. Paragraph 8 of the contract provided that General Houses was to receive a commission of 214 percent of the sales price of each house and that of this 2% percent, one-half was to be paid by Marloeh to General Houses and the other half was to be retained by Marloeh until the sums retained totaled the $20,000 advanced by Marloeh. General Houses sold only one house, earning a commission of $512.50. One-half of this amount, or $256.25, was retained by Marloeh, thereby reducing the $20,000 account to $19,743.75. The defendant claims that the amount should be disallowed as an item which is collectible by Marloeh from General Houses. However, the terms of the contract and the evidence otherwise shows that the $19,743.75 was not an uncollected account but was a prepaid expense, to be recouped by Marloeh only as and when General Houses realized sufficient commissions on sales of houses to repay such prepaid selling expenses. Therefore, the item is properly chargeable as an expense of the housing venture.
42. Cost of Installation of Special Facilities, and Loss on Liquidation of Special Facilities, $18f5J¡!7.6I¡..
These two items, which total $20,072.09, represent the amounts claimed by plaintiffs as a loss incurred in the liquidation of the facilities purchased and installed for the production of the prefabricated houses.
During World War II, Greenport was engaged as a war contractor in producing various types of war vessels, such as mine-sweepers, light river craft, and other equipment, all of which were built at its plant in Greenport, Long Island. This plant included over 30 different buildings, sheds, structures, docks, piers, marine railways, and other facilities. Greenport was not engaged in any business after the war, but during the year 1946 after the market guarantee program was announced, it organized Marloeh for the purpose of going into the business of producing prefabricated houses. At that time, Greenport owned plant assets having a ledger cost of more than $500,000. Under the 5-year tax amortization plan, *69 these assets had been amortized or depreciated to a net book value of $137,254.54. There was also other equipment which was fully written off on Greenport’s books. Since it was contemplated that Marloch would apply for a loan from EFC, Greenport transferred to Marloch a substantial portion of these plant assets having a net book value of $74,329.78. At the time of transfer, these assets were reappraised at $300,000, based on market values supported by an insurance appraiser. In return for these assets, including many facilities which were never used in the housing venture, Greenport received $300,000 in par value of Marloch’s stock. When the housing venture started, Marloch also acquired some additional machinery and equipment which were necessary for the fabrication of the houses. In April 1947, Greenport transferred additional plant assets to Marloch in exchange for $20,000 of stock. At about the time the manufacture of the houses ceased, all the assets that had been transferred by Greenport to Marloch were re-transferred to Greenport in return for and in cancellation of Marloch’s stock.
When the housing venture was liquidated, Greenport, which conducted the liquidation operations, proceeded also to liquidate all of the shipyard facilities it had owned prior to the time the housing venture was started, including all the plant assets which had been transferred to Marloch and some which had not. Most of the plant assets, including the equipment that was purchased for the production of houses, were sold in bulk lots, which included the assets which plaintiffs classified as “shipyard assets” not related to the housing venture, and other assets which they say were used in that venture. At the time the sales were made, there was no allocation of the proceeds of such sales in the sales documents themselves nor in plaintiffs’ books. Plaintiffs, however, claim that a list of the “shipyard assets” was recorded on its plant ledger separately from the assets used in the housing venture, and on this basis plaintiffs allocated the total proceeds under a method which showed a loss of $20,072.09 on the sale of the assets used for producing houses and a book profit of $141,143.11 on the sale of the shipyard assets. The record shows that plaintiffs incurred a cost of $1,524.45 for installing certain machinery and equipment for prefabricat *70 ing the houses, but the evidence does not establish that plaintiffs’ allocations are reasonably correct or that they lost the additional sum of $18,547.64 in the liquidation of facilities used in the housing venture. The amount claimed by plaintiffs as the cost of the facilities acquired and used for the housing venture cannot be reconciled with the total increase of plant assets finally accounted for, nor can a reasonably accurate determination be made of (1) the cost of such facilities, or (2) the proceeds of the sale thereof.
The defendant claims that since plaintiffs realized a book profit of $141,143.11 on the sale of plant assets, which plaintiffs eliminated from the claim as proceeds from the sale of shipyard assets, this profit should be applied toward the reduction of plaintiffs’ total claim after allowing, however, for the administrative and selling expenses incurred in the disposal of such assets and also excluded from the claim by the plaintiffs. It is reasonable to conclude from the evidence, however, that the major portion of the book profit from the sale of plant assets resulted from the disposition of facilities which had been purchased in prior years for war work but which had been amortized and reduced in book value below the liquidation prices received for them. Only a small portion of these plant assets were related to or used in the housing venture.
43. Jigs, Fixtures, Templates, etc. Written Off, $3,52 1¡,!70.
In the manufacture of the prefabricated houses, plaintiffs incurred a cost of $3,524.70 for jigs, fixtures, templates and patterns. These costs remained unamortized and were written off when production of the houses ceased. There is no dispute about the amount involved.
44. Plant Expenses During Liquidation, $15,917.85.
Plaintiffs claim plant expenses during the period of liquidation in the amount of $15,917.85. In the liquidation of the housing venture, plaintiffs actually incurred plant expenses amounting to $7,334.81. This was an overhead expense which has been allocated on the same basis as other overhead in Finding 47.
45. Administrative and Selling Expenses, $171,095.5Jh
Plaintiffs’ administrative and selling expenses amounted to $135,511.93 for the fiscal year ending October 31, 1947, *71 and to $95,655.96 for the fiscal year ending October 31, 1948.
Plaintiffs have allocated $223,833.08 of this expense on the basis of $171,095.54 to the housing venture and $52,-737.54 to the disposal of shipyard assets. The entire amount of the administrative expenses incurred during the period beginning November 1, 1946 and ending October 31, 1947, totaling $135,511.93, has been allocated by plaintiffs to the housing venture. In addition, plaintiffs have allocated the sum of $25,583.61 out of total administrative expenses incurred during the period November 1,1947 to April 30,1948, and the sum of $10,000 from administrative expenses incurred during the 8-month period beginning May 1,1948 and ending December 31,1948, to the housing venture.
In the administrative expenses thus allocated by plaintiffs, are executive salaries amounting to $130,750, including a salary of $52,000 per annum for Mr. Tulloch over the 2-year period. As heretofore stated, Mr. Tulloch, as president of Creenport, received an annual salary of $52,000 during the war years when Creenport employed a maximum of 1,200 people and had gross sales amounting to $6,000,000 a year. When Marloch was organized, the minutes of the corporation specifically provided that the salaries of the president and treasurer of Creenport were not to be charged to Marloch.
The production of the prefabricated houses by Marloch was in charge of Joseph Baltz, the Production Manager. He was an engineer, who had special training and skill in laying out and supervising the work of producing the houses, and devoted his full working time to that activity. While the houses were being prefabricated, Mr. Tulloch maintained an office in New York and visited the plant at Creenport on the average of about once a week.
As already stated, the liquidation operations were conducted by Creenport. By the end of August 1947, all executives of Marloch and Creenport, except Mr. Tulloch, had been removed from the payroll. The evidence demonstrates that a good job was performed by Mr. Tulloch in liquidating the housing venture. The 33 housing units were sold at an average price in excess of the limit of allowable costs specified in the General Houses contract. Recoveries on the liqui *72 dation of raw material inventories amounted to 98 percent of initial costs and there were substantial recoveries from the disposal of the machinery and equipment used in the prefabrication of the houses.
During the period that the technical experts of OHE were engaged in reviewing the applications of producers for the purpose of determining the limit of allowable cost, OHE considered that the reasonable range of executive salaries to be included in production costs was from $6,000 a year for executives of small producers to as much as $25,000 a year for the principal executives of companies who were engaged in producing a much larger quantity of houses than was called for in the General Houses contract.
From a review of all the evidence, it is found that a reasonable salary for the services performed by Mr. Tulloch in connection with the organization, operation, and liquidation of the housing venture is $20,000 per year.
46. There is included in plaintiffs’ claim for administrative expenses an item of $4,275.18, which represents the cost of labor and other expenses incurred in the operation of a cabin cruiser. This pleasure craft had been purchased and used by Greenport in connection with its shipyard activities during the war. After Mr. Baltz was employed as production manager, he moved from New Rochelle, New York, to Shelter Island, just across the bay from Greenport, and the cabin cruiser was used to shuttle him back and forth across the bay. There is also some evidence that the boat was used by Mr. Tulloch as a pleasant means of contacting customers. However, while the houses were being manufactured, Mar-loch had no customers, because the responsibility of selling the houses had been undertaken by General Houses. The evidence is not sufficient to establish what part, if any, of the cost of maintaining and operating the cabin cruiser was a necessary and proper cost of the housing venture.
47. Although the evidence does not afford any exact basis for determining the percentage of plaintiffs’ total administrative and selling expenses that should be allocated to the housing venture, a fair and reasonable allocation of such expenses is 50 percent thereof, or $81,446.35, which includes the following items:
*73 Executive salaries (including Mr. Tullo ch’s salary)- $33,375.00
Administration expenses_ 29, 053.26
Traveling and selling expense_ 15, 350.69
Plant expense during liquidation_ 3, 667.40
48. On the basis of the foregoing findings, plaintiffs’ total unrecovered costs arising out of the manufacture of the prefabricated houses and the liquidation of the housing venture under the General Houses contract amounted to the sum of $185,684.61, and consist of the following:
Manufacturing costs less recoveries_ $99,189.11
Cost of installation of special facilities_ 1,524.45
Jigs, fixtures, templates, etc. written off_ 3,524.70
General administrative and selling expenses_ 81,446.35
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are not entitled to recover, and the petition is therefore dismissed.

 Section 2 of the Act created the Office of the Housing Expediter, and defined the functions and powers of the Housing Expediter. These included the formulating of plans and programs to provide for an increased supply of housing accommodations, the issuance of orders, regulations, or directives to other executive agencies, etc.

 The Reviser’s Notes of the 1948 codification of Title 28 U. S. C. states that “changes were made in phraseology.” However, the insertion of the words “united States” was a substantive change but has no bearing on this case.

 The Appeal Board’s opinion appears at page 44 of “Defendant’s Answer to Plaintiffs’ Motion to Strike Defenses.”